# Exhibit 2

**KBRA** — **KROLL BOND RATING AGENCY**

**Structured Finance**

ABS New Issue Report

# Kabbage Asset Securitization LLC, Series 2017-1 Additional Notes

**$25 Million Additional Issuance under the "expandable" terms of the Series 2017-1 Notes**

**$550 Million aggregate, including original $525 Million Series 2017-1 Notes**



**Analytical Contacts:**

Alan Greenblatt, Director
agreenblatt@kbra.com, (646) 731-2496

Lenny Giltman, Managing Director
lgiltman@kbra.com, (646) 731-2378

Anthony Nocera, Senior Managing Director
anocera@kbra.com, (646) 731-2350

Chris Baffa, Associate Director
cbaffa@kbra.com, (646) 731-3312

*August 28, 2017*

**KBRA** KROLL BOND RATING AGENCY

## Table of Contents

Executive Summary ........................................................................................................................... 3

   Transaction Overview ................................................................................................................. 4

   Key Credit Considerations ......................................................................................................... 6

Performance of Current Securitization .................................................................................... 11

KBRA Process ................................................................................................................................ 11

Transaction Summary .................................................................................................................. 12

Seller and Servicer ...................................................................................................................... 13

   Company Overview .................................................................................................................. 13

   Management ............................................................................................................................... 14

   Originations ................................................................................................................................ 15

   Underwriting ............................................................................................................................... 16

   Financial Condition and Liquidity ......................................................................................... 17

   Servicing ...................................................................................................................................... 17

   Regulatory .................................................................................................................................. 18

Historical Performance ............................................................................................................... 19

   Originations ................................................................................................................................ 19

   Gross Charge-Offs .................................................................................................................... 20

KBRA Loss Expectation .............................................................................................................. 21

Cash Flow Analysis ...................................................................................................................... 21

Rating Sensitivity and Surveillance ......................................................................................... 22

Transaction Structure ................................................................................................................. 23

**KBRA** KROLL BOND RATING AGENCY

# Executive Summary

This transaction report is based on information regarding the underlying collateral pool and the terms of the securitization as of August 28, 2017. The ratings listed below are for $25 million in additional issuance under the "expandable" terms of the Kabbage Asset Securitization LLC, Series 2017-1 Notes. In addition, the ratings for the $525 million of original Series 2017-1 Notes are confirmed in conjunction with the issuance of the following classes of additional Series 2017-1 Notes. The ratings listed below for the $25 million Series 2017-1 Additional Notes are final. The ratings for the $525 million original Series 2017-1 Notes are final. This report does not constitute a recommendation to buy, hold, or sell securities. Kroll Bond Rating Agency's (KBRA) ratings represent the timely payment of interest and ultimate payment of principal of each class of notes by the applicable legal final payment date.

| Rated Notes - $25 Million Series 2017-1 Additional Notes | | | | | | |
|---|---|---|---|---|---|---|
| Notes | Initial Principal Balance | Note Rate | Advance Rate | Initial Credit Enhancement* | Legal Final Payment Date | KBRA Rating |
| Class A | $18,518,000 | 4.571% | 70.00% | 30.50% | March 2022 | A (sf) |
| Class B | $3,968,000 | 5.794% | 85.00% | 15.50% | March 2022 | BBB (sf) |
| Class C | $1,323,000 | 8.000% | 90.00% | 10.50% | March 2022 | BB (sf) |
| Class D | $1,191,000 | 10.000% | 94.50% | 6.00% | March 2022 | B (sf) |
| Total: | $25,000,000 | | | | | |

\* Initial credit enhancement shown above includes overcollateralization, subordination and the Series 2017-1 Reserve Account.

| Rated Notes - $525 Million Original Series 2017-1 Notes | | | | | | |
|---|---|---|---|---|---|---|
| Notes | Initial Principal Balance | Note Rate | Advance Rate | Initial Credit Enhancement* | Legal Final Payment Date | KBRA Rating |
| Class A | $388,889,000 | 4.571% | 70.00% | 30.50% | March 2022 | A (sf) |
| Class B | $83,333,000 | 5.794% | 85.00% | 15.50% | March 2022 | BBB (sf) |
| Class C | $27,778,000 | 8.000% | 90.00% | 10.50% | March 2022 | BB (sf) |
| Class D | $25,000,000 | 10.000% | 94.50% | 6.00% | March 2022 | B (sf) |
| Total: | $525,000,000 | | | | | |

\* Initial credit enhancement shown above includes overcollateralization, subordination and the Series 2017-1 Reserve Account.

# Transaction Overview

Kabbage Asset Securitization LLC (the "Issuer") issued $525 million of Series 2017-1 Class A, Class B, Class C and Class D Notes (collectively, the "Series 2017-1 Notes") on March 20, 2017. The Issuer issued $25 million of additional Series 2017-1 Class A, Class B, Class C, and Class D Notes (collectively, the "Series 2017-1 Additional Notes", together with the Series 2017-1 Notes, the "Notes"). The Series 2017-1 Additional Notes will have the same terms as the corresponding classes of Series 2017-1 Notes, including same Note Rate, Advance Rate and Legal Final Payment Date. The proceeds of the sale of the Series 2017-1 Additional Notes will be used to provide extra funding capacity for Kabbage.

Founded in 2009, Kabbage is a financial technology company that uses its proprietary risk scoring models, transactional data, technology systems and platform to provide fully automated, online access to business loans (the "SMB Loans") for small- and medium-sized businesses ("Merchants"). Kabbage has also provided working capital to Merchants by purchasing a specified amount of a Merchant's future receivables known as merchant cash advances ("MCAs"). Approximately 0.01% of the Receivables in the Statistical Pool consist of MCAs. The Kabbage business loan program (the "Kabbage Program") is offered via Kabbage's automated loan application, underwriting and servicing platform (the "Kabbage Platform").

The Kabbage Platform currently allows Merchants to access uncommitted business lines of credit up to $150,000 for a 6- or 12- month installment loan issued by Celtic Bank, a Utah chartered industrial bank, member FDIC ("Celtic Bank"). A business approved under the Kabbage Program can draw on the line up to the credit limit as needed, however Kabbage can cut off the borrower's ability to draw on the business line for a variety of reasons including missed payments. Kabbage is expecting to launch loan products with 18-, 24- and 36-month terms in exposure limits up to $400,000 in the future, although loans in excess of 18 months or $250,000 will not be included in this transaction. The average original receivables balance per Receivable and weighted average original term in the Statistical Pool is $7,486.20 and 9.0 months, respectively.

The SMB Loan or MCA borrowed by the Merchant is repaid in equal principal payments over the original term of the loan with interest charges based on the initial borrowed amount. Each loan will have a "big fee" (typically 2% to 11%) for the first 2 months for 6-month loans and the first 6 months for 12-month loans, as well as a 1% "small fee", for the remaining term of the loan. For the 18-month loans the "big fee" will be for the first 10 months.

The Notes will be secured by a revolving pool of receivables (the "Receivables" or the "Portfolio") consisting of (i) SMB Loans or (ii) MCAs. The transaction features a revolving period (the "Revolving Period"), which will end on the earlier of (i) the payment date occurring in the month that is 36 months after the initial closing date and (ii) the date on which a Rapid Amortization Event has occurred.

The Notes will be "expandable" term notes such that at any time during the Revolving Period, the Issuer may periodically issue additional Notes, so long as certain conditions are met, including receipt of rating agency confirmation. The consent of existing noteholders will not be required for these additional issuances, and investors should note that any additional note issuance would dilute the control and vote of existing noteholders.

As of December 31, 2016, the statistical pool of receivables (the "Statistical Pool") had an aggregate outstanding receivables balance of $442,434,677.71 (the "Statistical Balance").

| Transaction Parties | |
|---|---|
| Issuer | Kabbage Asset Securitization LLC |
| Seller and Servicer | Kabbage, Inc. |
| Platform | **www.kabbage.com** |
| Initial Backup Servicer | First Associates Loan Servicing, LLC |
| Indenture Trustee and Custodian | U.S. Bank National Association |
| Originator / Credit Sponsor / Funding Bank | Celtic Bank, a Utah chartered industrial bank |
| Administrator | CBIZ MHM LLC |
| Sole Structuring Advisor, Book-Running Manager and Initial Purchaser | Guggenheim Securities, LLC |

**KBRA** **KROLL BOND RATING AGENCY**

# Key Credit Considerations

## Strength of the Seller and Servicer

Founded in 2009, Kabbage is a financial technology company that uses financial services data and technology platform to provide business loans to Merchants. Since inception, Kabbage has funded over $3.3 billion for over 100,000 customers. The Company has over 380 employees with offices in Atlanta, San Francisco, New York, Ireland and India. Members of the senior management team have over 20 years of experience in payment processing, financial services and/or small business marketplace lending.

Kabbage previously sponsored a securitization in September 2014 which was rated by KBRA and performed in line with expectations. The 2014 transaction was refinanced in March 2017, and subsequently the ratings were withdrawn. KBRA believes Kabbage has an experienced management team and the operational capabilities to service the Portfolio.

On August 3, 2017, Kabbage announced that it entered into a definitive agreement for an equity investment of $250.0 million from SoftBank Group Corp. to help expand its lending products for small- and medium-sized businesses, to accelerate its software as a servicer platform business and to explore other strategic opportunities for its small- and medium-sized business customers. The closing of the investment is subject to regulatory and other customary closing conditions and is expected to be completed in the third quarter of 2017.

## Transaction Structure

KBRA believes the transaction has sufficient credit enhancement, along with a structure that accelerates principal payments on the Notes upon a deterioration of asset performance to support the rating on the Notes. Key credit enhancements will consist of:

- Excess Cash Flow:

    - The weighted average receivables yield of the Statistical Pool is approximately 41.11%, which should result in significant excess spread over the coupons of the Notes and monthly fees and expenses. Regarding additional receivables to be purchased by the Issuer during the Revolving Period, the transaction documents require that the weighted average receivables yield for the entire pool to be at least 38.00% per annum and the receivables yield on any individual receivable to be at least 19.00% per annum.

    - Monthly distributions of principal pursuant to the priority of payments will include a yield supplement amount.

- Overcollateralization:

    - Class A Notes: Maximum advance rate: 70.00% (30.00% overcollateralization)

    - Class B Notes: Maximum advance rate: 85.00% (15.00% overcollateralization)

    - Class C Notes: Maximum advance rate: 90.00% (10.00% overcollateralization)

    - Class D Notes: Maximum advance rate: 94.50% (5.50% overcollateralization)



## Key Credit Considerations

- <u>Reserve Account</u>: Funded on the initial closing date with $2,777,778, and will be funded on the additional notes closing date with $132,275 to maintain an amount equal to approximately 0.50% of the aggregate outstanding principal balance of the Notes divided by 94.50% (the "Series 2017-1 Required Reserve Account Amount").

- <u>Subordination</u>: Each junior class of Notes will be subordinated in right of payment to each class of Notes that is senior.

- <u>Trigger Events</u>: Occurrence of any of the following events will cause principal payments on the Notes to be accelerated (with payments occurring sequentially):

  - the three-month weighted average receivables yield on such payment date is less than 38.00%;

  - the three-month weighted average excess spread on such payment date is less than 8.00%; or

  - the three-month average delinquency ratio on such payment date is greater than 15.00%.

- <u>Servicing Fee</u>: If Kabbage is the Servicer, the servicing fee is payable after interest and principal on the Notes, however KBRA assumed Kabbage is no longer the Servicer in its cash flow analysis.

Additional information is included in the **Transaction Structure** section.

### Revolving Period and Prefunding Feature

When the initial transaction closed in March 2017 it featured a 36-month revolving period (the "Revolving Period"), which currently has 32 months remaining, during which time no payments of principal of the Notes will be made unless the Issuer elects to prepay the Notes in full on or after the payment date in March 2019. Cash flow from principal collections may be reinvested to purchase additional receivables, based on certain eligibility requirements. The existence of the Revolving Period adds uncertainty to the Portfolio composition and could allow the Portfolio to become more concentrated and vary somewhat from the additional notes closing date.

On the additional notes closing date, the transaction may only contain (but not less than) 85% of the Targeted Closing Receivables Balance. If 100% of the Target Closing Receivables Balance isn't transferred on the additional notes closing date, an amount (the "Prefunded Amount"), if any, will be deposited into the Series 2017-1 Excess Funding Account, which amounts will be available for the purchase of additional Receivables. The remaining Receivables are expected to be transferred to the Issuer during the next three to six weeks after closing.

All additional receivables must satisfy the eligibility criteria described further in the offering document and within the **Transaction Structure** section. KBRA has assumed that the cash flow will be reinvested to the "worst case" Portfolio permitted within the transaction's eligibility requirements.

**KBRA** | **KROLL BOND RATING AGENCY**

## Key Credit Considerations

### Portfolio Remaining Term

The Statistical Pool has an initial weighted average remaining term of approximately 7.7 months. There are restrictions when adding additional receivables that such receivable, together with all other Eligible Receivables, has a weighted average remaining term of no more than 13 months. In addition, Excess Concentration Amounts limit 50% of the Portfolio to have a remaining term greater than 6 months or more and further limit 10% of the Portfolio to have a remaining term greater than 12 months or more. The shorter remaining term allows for less time for an obligor default to occur. KBRA recognizes the tenor of the loans could create potential stress or affordability issues for the obligors due to the high rates and short term nature of the loans. KBRA has addressed this concern in its analysis of the historical performance of the loans and the cash flow analysis within.

**+/-**

### Limited Performance Data for Longer Loan Terms

Kabbage has limited operating history on its 12-month and 18-month loans that may be included in the Portfolio. Kabbage first originated 6-month loans in 2011 and 12-month loans in January 2015, with 18-month loans part of a new product launch expected to occur in 2017.

Loans with remaining terms of 12 months can be up to 50% of the Portfolio, with a sublimit of loans with remaining terms of 18 months up to 10% of the Portfolio. To account for the limited data, additional stresses were applied to the KBRA base case assumption and loss multiples were stressed for each note rating category.

**–**

### Internet Lending

Internet-based lending is inherently riskier than in-person lending as there is a greater potential for falsification of information and borrower fraud. Applicants may also misrepresent their intentions regarding loan purpose or treat their obligations on the loans originated through the internet as having less significance and a lower payment priority to those loans originated through traditional lending sources where they may have other business relationships. Therefore, an online lender needs to possess adequate internal controls and robust fraud detection procedures.

Kabbage uses identity and fraud checks analyzing data provided by external databases to authenticate each borrower's identity. Any loans that were originated to customers with verifiable identity theft or fraud must be repurchased by Kabbage. KBRA believes Kabbage possesses adequate resources and procedures for information verification and fraud detection.

**+/-**

### Regulatory Environment for Online Lenders

The online lending industry was a high-growth, high-profile sector that has attracted the attention of various regulators and the regulatory oversight of securities and capital markets. Although there have not been any statutory or regulatory requirements imposed specifically on online lenders to date, in 2015, the U.S. Treasury Department issued a request for information on online lending. The Treasury Department received a large number of responses from a variety of stakeholders. In May 2016, the US Treasury Department released its response in a

**+/-**

**KBRA** **KROLL BOND RATING AGENCY**

# Key Credit Considerations

white paper titled "Opportunities and Challenges in Online Marketplace Lending". In response to the white paper, Kabbage has incorporated into their merchant agreements a comparison tool called the SMART (Straightforward Metrics Around Rate and Total Cost) Box. The SMART Box is focused on empowering small businesses to better assess and compare finance options as well as advance small business online lending education and transparency. There will likely be greater regulation to address the recommendations in the report.

Furthermore, in December 2015, the California Department of Business Oversight launched an inquiry into 14 online lenders, including Kabbage. In May 2016, the New York Department of Financial Services requested information from 28 online lending companies. There is a possibility that Kabbage's business may become subject to additional or different regulations in the future.

Although Merchants agree that they are entering into a commercial transaction and that the proceeds of the SMB Loans will be used solely for business purposes and will not be used for personal, family, or household purposes, if the SMB Loans are deemed not to constitute business loans, Kabbage could become subject to the purview of the CFPB and other additional federal and state regulatory agencies. Such additional regulatory scrutiny and potential additional regulation could impose specific statutory liability on creditors who fail to comply with the provisions of applicable laws and regulations.

KBRA anticipates this regulatory scrutiny will continue over the next few years but believes that Kabbage is proactively seeking to address any regulatory concerns and promote transparency in its lending platform operations.

## Challenges to Exportation of State Usury Laws and True Lender Issues

Loans from the Kabbage Platform are currently originated by Celtic Bank, a Utah chartered industrial bank. Federal law generally permits the exportation of usury laws in effect in the state in which the bank is organized to a borrower's state. Recently, however, some courts have ruled that Federal preemption of state interest caps would not apply in some circumstances. In May 2015, for instance, the Second Circuit ruled in *Madden v. Midland Funding* that a non-bank purchaser of charged-off credit card loans cannot rely on state law preemption to charge interest rates that exceeded the usury limit in New York. Although the *Madden* ruling only applies to New York, Connecticut and Vermont, and it only addressed a consumer credit product, it is possible similar decisions could be adopted by courts in other jurisdictions or that other courts or regulators could choose to review small business loans in the context of usury or true lender issues in a manner akin to the scrutiny given consumer credit products.

Kabbage believes the legal structure underlying Kabbage's relationship with Celtic Bank is distinguishable from the structure in the *Madden* case. Furthermore, Kabbage believes it is unlikely that courts or regulators would apply the same level of scrutiny afforded to consumer credit products as it would to Kabbage's credit products considering Kabbage's underwriting processes. To date, no actions have been taken or threatened against Kabbage on the theory that it has engaged in unauthorized lending or loan brokering through its relationship with Celtic Bank.



# Key Credit Considerations

### Relationship with Celtic Bank

Celtic Bank is currently the primary issuing bank for all receivables originated through the Kabbage Platform. Kabbage has agreed to purchase all receivables associated with such SMB Loans, which receivables represent an undivided ownership interest in up to 100% of all amounts due or to become due by the Merchants under the related agreement. The transaction documents allow Kabbage to contract with another funding bank ("Credit Sponsor") to originate receivables to be sold to the Issuer during the Revolving Period without noteholder consent, although rating agency confirmation would be required.

The agreement between Kabbage and Celtic Bank is scheduled to terminate in March 2019 but is subject to automatic renewal for successive one year terms. The agreement with Celtic Bank is not exclusive and does not prohibit Celtic Bank from working with competitors of Kabbage or prohibit Kabbage from potentially entering into bank relationships with other Credit Sponsors.

### Third Party Due Diligence Review

CBIZ MHM LLC ("CBIZ" or the "Administrator") will be engaged to provide certain reporting services both monthly and annually, which will include, among other items:

*Monthly Services*:

- Recalculate certain data fields,
- Calculate the total interest due for the Notes;
- Calculate the Receivables pool balance;
- Calculate the ineligibles total amounts and the over concentration total amounts;
- Calculate the 94.50% of the Receivables adjusted pool balance;
- Calculate the asset deficiency amount; and
- Review a sample of 100 Receivables and compare, confirm or calculate, as applicable, 15 data fields (the "Receivables File Review").

In connection with each Receivables File Review, if the sample error rate of any of the data fields exceeds 4%, then the Administrator will notify the respective service providers of the data integrity discrepancy (a "Receivables File Discrepancy Event") and 200 Receivables will be sampled by the Administrator the following month. If based on the results of the 200 Receivables tested in the following month results in a data field exceeding 4%, a Receivables File Discrepancy Event and an Event of Default will occur under the Indenture.

*Annual Services*:

- Management discussion and overview,
- Underwriting/credit approval summary,
- Servicing and collections summary and
- Internal, external and regulatory audit and systems review.

# Performance of Current Securitization

The Kabbage Asset Securitization LLC, Series 2017-1 transaction performance is in-line with KBRA's base case scenario and is still within its reinvestment period during which time principal collections have been reinvested into additional eligible receivables. Since the transaction closed, all timely interest has been paid to investors. Additionally, No Rapid Amortization Event has occurred.

| Rapid Amortization Events with respect to the Series 2017-1 Notes | | | |
|---|---|---|---|
| **Trigger Events** | | **As of July 2017 Payment Date** | **Status** |
| a) | occurrence of any of the following events: | | |
| | i)   Three-Month Weighted Average Receivables Yield less than 38.00%? | 46.5% | Pass |
| | ii)  Three-Month Weighted Excess Spread less than 8.00%? | 30.1% | Pass |
| | iii) Three-Month Average Delinquency Ratio greater than 15.00%? | 6.5% | Pass |
| b) | existence of a Series 2017-1 Asset Deficiency for three (3) or more business days? | No | Pass |
| c) | occurrence of a Servicer Default? | No | Pass |
| d) | occurrence of an Event of Default with respect to the Series 2017-1 Notes under the Transaction Documents? | No | Pass |
| e) | occurrence of certain specified bankruptcy or insolvency events of either the Seller of the Servicer? | No | Pass |

# KBRA Process

KBRA analyzed the transaction using the **General Rating Methodology for Asset-Backed Securities** published on July 30, 2012. The transaction falls within Category 1 – Financial Assets, which typically relates to transactions that are backed by pools of consumer or commercial financial obligations owed by diverse obligors with payment terms that fully pay interest and principal on the Asset-Backed Securities.

KBRA's general methodology incorporates an analysis of: (1) the underlying collateral pool, (2) the platform's historical static pool data, segmented by characteristics including credit quality and product type, (3) the proposed capital structure for the transaction, (4) KBRA's operational assessment of the platform and servicer, and (5) the legal structure, transaction documents, and legal opinions.

KBRA has performed an on-site operational review of the Company in June 2016 at their Atlanta, GA headquarters and has met with the Company for updates. In addition, KBRA conducted phone interviews with a representative from Celtic Bank to discuss its underwriting process and arrangement with Kabbage.

**KBRA** KROLL BOND RATING AGENCY

# Transaction Summary

The table below summarizes the characteristics of the Statistical Pool as of December 31, 2016.

| Kabbage Asset Securitization LLC, Series 2017-1 | |
|---|---|
| **Collateral Stratification** | |
| Number of Receivables | 97,529 |
| Number of Merchants | 29,311 |
| Average Number of Receivables per Merchant | 3.3 |
| Pool Outstanding Receivables Balance | $442,434,678 |
| Average Outstanding Receivables Balance per Receivable | $4,536 |
| Maximum Outstanding Receivables Balance per Receivable | $100,000 |
| Average Outstanding Receivables Balance per Merchant | $15,094 |
| Maximum Outstanding Receivables Balance per Merchant | $150,035 |
| Aggregate Original Receivables Balance | $730,121,187 |
| Average Original Receivables Balance per Receivable | $7,486 |
| Average Original Receivables Balance per Merchant | $24,909 |
| Weighted Average Receivable Yield at Origination | 41.11% |
| Weighted Average Original Term (months) | 9.0 |
| Weighted Average Remaining Term (months) | 7.7 |
| Weighted Average Age (months) | 2.2 |
| Weighted Average FICO Score | 692 |
| Weighted Average Kabbage Score | 698 |
| Weighted Average Time in Business (years) | 9.2 |
| Weighted Average Annualized Gross Revenue | $916,182 |
| **Range of Remaining Term to Maturity Distribution** | |
| 1 to 6 months | 59.03% |
| 7 to 12 months | 37.19% |
| 13 or more months | 3.79% |
| **Original Term to Maturity Distribution** | |
| 6 months | 49.33% |
| 12 months | 50.67% |
| **Range of Kabbage Score Distribution** | |
| 560 to 599 | 1.22% |
| 600 to 649 | 8.62% |
| 650 to 699 | 36.62% |
| 700 to 749 | 53.01% |
| 750 to 799 | 0.51% |
| 800 to 850 | 0.02% |
| **Geographic Concentration** | |
| Largest State | California:  15.80% |
| Second Largest State | Florida:  10.43% |
| Third Largest State | Texas:  7.94% |

In addition, the Receivables must satisfy the Eligibility Criteria further described in the offering document and within the Transaction Structure section.

The table below summarizes the credit enhancement structure of this transaction. The balances of the classes below include $525,000,000 of Series 2017-1 Notes issued on the initial closing date and $25,000,000 of Series 2017-1 Additional Notes that will be issued on the additional notes closing date.

| Kabbage Asset Securitization LLC | |
|---|---|
| **Transaction Structure** | |
| Class A Balance | $407,407,000 |
| Class B Balance | $87,301,000 |
| Class C Balance | $29,101,000 |
| Class D Balance | $26,191,000 |
| Total Balance | $550,000,000 |
| Class A Advance Rate / Initial CE[1] | 70.00% / 30.50% |
| Class B Advance Rate / Initial CE[1] | 85.00% / 15.50% |
| Class C Advance Rate / Initial CE[1] | 90.00% / 10.50% |
| Class D Advance Rate / Initial CE[1] | 94.50% / 6.00% |
| Reinvestment Period[2] | 36 months |
| Reserve Account | 0.50% |
| **KBRA Ratings** | |
| Class A | A (sf) |
| Class B | BBB (sf) |
| Class C | BB (sf) |
| Class D | B (sf) |
| **KBRA Base Case Loss Expectation** | |
| KBRA Base Case Loss Range | 9.00% - 11.00% |

[1] Initial credit enhancement (CE) shown only includes overcollateralization, subordination and the Series 2017-1 Reserve Account.

[2] As of the initial closing date on March 20, 2017.

# Seller and Servicer

## Company Overview

Founded in 2009, Kabbage is a financial technology company that uses its proprietary risk scoring models, transactional data, technology systems and platform to provide fully automated, online access to business loans (the "SMB Loans") for small- and medium-sized businesses ("Merchants"). Kabbage has also provided working capital to Merchants by purchasing a specified amount of a Merchant's future receivables known as merchant cash advances ("MCAs"). The Kabbage business loan program (the "Kabbage Program") is offered via Kabbage's automated loan application, underwriting and servicing platform (the "Kabbage Platform").

The Kabbage Platform allows Merchants to access uncommitted business lines of credit up to $199,000 for a 6- or 12- month installment loan issued by Celtic Bank, a Utah chartered industrial bank, member FDIC ("Celtic Bank"). Initially, the Kabbage Program offered a 6-month term product and in January 2015, the Kabbage Program began offering a 12-month term product. Kabbage is expecting to launch loan products with 18-, 24- and 36- month terms in exposure limits up to $400,000 in the future, although loans in excess of 18 months or $250,000 will not be included in this transaction. Kabbage also licenses its Kabbage Platform to financial institutions and other organizations across the globe.

**KBRA** KROLL BOND RATING AGENCY

Under the Kabbage Program, Celtic Bank underwrites, originates and funds the SMB Loans while Kabbage serves as the program manager providing marketing, origination, application processing, loan servicing and collection services for all loans. Under an agreement with Celtic Bank, Kabbage purchases the right to all of the loan payments and other receivables associated with such SMB Loans. Celtic Bank retains title to the underlying SMB Loans through maturity, but has agreed to transfer title under certain circumstances.

Since inception, Kabbage has funded over $3.3 billion for over 100,000 customers through the Kabbage Platform. The Company has over 380 employees with offices in Atlanta, San Francisco, New York, Ireland and India.

## Management

During 2016, KBRA met with Kabbage's management team, including those responsible for credit, business development, finance and operations. Since the initial closing date, Kabbage's management team has had some changes and KBRA has met with some of those members as well. Members of the senior management team have over 20 years of experience in the payment processing, financial services and/or small business marketplace.

### Rob Frohwein, Chief Executive Officer

Frohwein is the chief executive officer and co-founder of Kabbage. Prior to Kabbage, Frohwein was CEO of LAVA Group, Inc., an intellectual property and technology investment bank. Prior to LAVA Group, Frohwein held the positions of senior vice president, business development and general counsel of ZapMedia, vice president of strategic alliances and general counsel of Security First Network Bank, and an attorney with Troutman Sanders LLP, an international law firm. Frohwein is a graduate of Villanova Law School and studied economics at Dickinson College in Carlisle, PA.

### Kathryn Petralia, Chief Operating Officer

Petralia is the chief operating officer and co-founder of Kabbage. She has spent the past 20 years working with both startups and established companies focused on credit, payments, technology and ecommerce. Prior to Kabbage, Petralia was with Revolution Money, an internet-based credit card startup based in St. Petersburg, Florida, where she was vice president of strategy. Before Revolution, Petralia was a corporate development executive with CompuCredit Corporation, where she was responsible for entering new markets, initiating new product development and establishing multiple strategic alliances. Petralia was also one of the founders of worthknowing.com, a consumer financial services portal. She holds a B.A. in english literature from Furman University.

### Kevin Phillips, Head of Corporate Development

Phillips is the head of corporate development at Kabbage. Phillips served as chief financial officer of Kabbage through December 2015. Prior to his appointment as CFO, he was Kabbage's chief technology officer responsible for the development of Kabbage's technology platform. Phillips spent the previous seven years as chief operating officer of Scientific Intake, a Class 1 medical device company. Prior to Scientific Intake, Phillips served as chief information officer of several Atlanta based technology companies. After starting his career with Deloitte, he also had senior technology and operational roles in Europe and the United States. He has an undergraduate degree from Washington College in Chestertown, Maryland and an MBA from Georgia State University.

### Deepesh Jain, Head of Capital Markets

Jain is the head of capital markets at Kabbage where he is responsible for raising funding from banks and other institutional investors to help fund Kabbage's small business loans. Before joining Kabbage, Jain spent nearly 10 years at Capital One where he began in their debt capital markets group managing their credit card securitization programs. Later, he served as senior compliance manger, managing operational risk and regulatory compliance. Most recently, Jain was the head of U.S. capital markets execution at Barclays for six years. There, he oversaw treasury-related capital market activities in the U.S. Jain has an MBA from Cornell University.

**KBRA** KROLL BOND RATING AGENCY

# Originations

## Kabbage

Kabbage targets marketing of the Kabbage Program towards small businesses with 1 to 50 employees, $50,000 to $10 million in annual revenue, and across all industry verticals. Kabbage's marketing department, which consists of approximately 20 employees, focuses on brand marketing to grow awareness, acquisition programs through direct channels to acquire customers, site and funnel optimization to increase conversion for applications, and customer loyalty marketing to drive utilization.

Kabbage sources customers through multiple acquisition channels, including: (1) search engine marketing and search engine optimization, (2) direct mail, (3) strategic referral partners, (4) Facebook and other display advertising, (5) radio and brand advertising, and (6) content marketing and partners. Kabbage sources loans on behalf of Celtic Bank in all 50 states, U.S. territories and the District of Columbia.

All SMB Loans are originated in the name of Celtic Bank, and Kabbage arranges financing for the Kabbage Program by purchasing the receivables associated with such loans. Since inception, Kabbage has funded over $3.3 billion for over 100,000 customers. Through the Kabbage Platform, there have been originations of $1.2 billion, $877 million and $339 million in 2016, 2015, and 2014, respectively. As of June 30, 2017, Kabbage has over $700 million in originations year-to-date for 2017. Kabbage has also been evaluating the possibility of obtaining a FinTech Charter.

## Celtic Bank

Under the Kabbage Program, Celtic Bank underwrites, originates and funds the SMB Loans made to Merchants under the Kabbage Program. Kabbage serves as the program manager and provides marketing, origination, application processing, loan servicing and collection services for all SMB Loans originated by Celtic Bank. All program materials and changes, including any statements, disclosures or promotional materials are subject to review and approval by Celtic Bank. Kabbage has agreed to purchase all receivables associated with such SMB Loans, which receivables represent an undivided ownership interest in up to 100% of all amounts due or to become due by the Merchants under the related agreement. The transaction documents allow Kabbage to contract with another funding bank to originate receivables to be sold to the Issuer during the Revolving Period without noteholder consent, although rating agency confirmation would be required.

The agreement between Kabbage and Celtic Bank is scheduled to terminate in March 2019 but is subject to automatic renewal for successive one year terms unless either Kabbage or Celtic Bank provides notice of non-renewal to the other party at least 60 days prior to the end of the initial term or any subsequent renewal term. The agreement with Celtic Bank is not exclusive and does not prohibit Celtic Bank from working with competitors of Kabbage or prohibit Kabbage from potentially entering into bank relationships with other funding banks ("Credit Sponsors").



# Underwriting

Underwriting for qualified Merchants and, by extension, SMB Loans made under the Kabbage Program are governed by Celtic Bank's credit policy. As the program manager, Kabbage applies Celtic Bank's credit policy as part of the underwriting process. The underwriting process for SMB Loans is fully automated. Celtic Bank uses the Kabbage Platform and related technology, including Kabbage's proprietary risk scoring model, to apply its credit policy to generate automated credit decisions.

Kabbage maintains certain credit policy requirements for all loans. Any loan that meets these predetermined requirements receives a loan offer that is subject to completion of all verification processes prior to being funded.

| Group Credit Policy Requirements* | |
| --- | --- |
| Maximum Loan Term | 36 months |
| Maximum Loan Amount | $400,000 |
| Minimum Time in Business | 1 year |
| Minimum FICO score | 539 |
| Minimum Kabbage Score | 300 |
| Minimum Annual Revenue | $12,000 |
| or | |
| Minimum Average Bank Balance | $3,000 |

> \* Loans in excess of 18 months, exceed $250,000, or a Kabbage Score
>   of less than 560 will not be included in this transaction.

Underwriting decisions are made by a methodology that encompasses the following four categories:

- <u>Authentication</u>: Kabbage utilizes multiple information sources to verify the applicant and ownership of the business.

- <u>Exposure Capacity</u>: Each Merchant will be analyzed according to an appropriate model to determine cash flow available for financing.

- <u>Character</u>: Applicant's experience, motivation and character of the business (such as customer reviews/feedback) will be evaluated.

- <u>Consistency</u>: Cash flow efficiencies and revenue generation from the business's operation are analyzed.

Kabbage's proprietary risk scoring model assigns each applicant a score (the "Kabbage Score") ranging from 300 to 850. Applicants with lower Kabbage Scores have a higher probability of becoming a delinquent or defaulted receivable. Receivables with a Kabbage Score of less than 560 will not be eligible in this transaction.

Kabbage utilizes a proprietary risk model to assess the risk of prospects and applications. The Kabbage risk scoring model considers thousands of data elements from multiple sources including the credit bureaus, business sales performance, and information collected during the underwriting process to ensure that a full spectrum of knowledge on the borrower is acquired to assess risk. These borrower attributes relate to:

- Business Performance
- Business Characteristics
- Contract Risk
- Applicant's Consumer Credit Report
- Macroeconomic Factors
- Past Performance
- Online Footprint

**KBRA** KROLL BOND RATING AGENCY

# Financial Condition and Liquidity

Kabbage has incurred operating losses since its inception; however, the Company expects to be profitable by the fourth quarter of 2017. Total revenue in 2016 has been approximately $171.9 million compared to $65.5 million for 2015. Kabbage intends to expend significant funds to continue to grow its business, including to acquire customers and to fund ongoing operations. Kabbage has historically financed its operations through the issuance of debt and equity. On August 3, 2017, Kabbage announced that it entered into a definitive agreement for an equity investment of $250.0 million from SoftBank Group Corp. to help expand its lending products for small- and medium-sized businesses, to accelerate its software as a servicer platform business and to explore other strategic opportunities for its small- and medium-sized business customers. The closing of the investment is subject to regulatory and other customary closing conditions and is expected to be completed in the third quarter of 2017.

As of year-end 2016 Kabbage had $160.0 million dollars in cash, with approximately $27.0 million unrestricted and available for immediate liquidity. It is expected that the proceeds of the $25 million sale of the Series 2017-1 Additional Notes will be used to provide additional funding capacity for Kabbage.

# Servicing

Kabbage will act as Servicer for this transaction and First Associates Loan Servicing, LLC will act as backup servicer. In servicing the loans, Kabbage will be required to follow the same collection policies and procedures it will follow with respect to comparable SMB Loans that it owns or services for others.

The Servicer's servicing team uses the loan servicing platform to monitor and track payment activity. With built-in payment tracking functionality and automated missed payment notifications, the loan servicing platform allows the Servicer to monitor performance of outstanding loans on a real time basis.

Kabbage's customer service and collections teams are staffed by personnel located in the Kabbage's Atlanta office. Kabbage's collections representatives, which consist of about 15 personnel, are responsible for attempting to contact borrowers who have not made or are in danger of not making their minimum payments. Kabbage outsources some collections activity to external collections agencies for purposes of benchmarking internal collections performance as well as maintains relationships with such agencies in the event of disaster recovery situations or short-term capacity shortages.

The servicing policies and procedures currently used by Kabbage are:

- Loan Payments: The loan servicing platform automatically initiates an ACH or PayPal debit for scheduled payments on loans in accordance with the applicable payment schedule and tracks payment flow.

- Delinquency Management: A loan is characterized as delinquent if any scheduled loan payment has not been received in full by the next cycle date. A scheduled loan payment is missed when an ACH or PayPal debit attempt is not successful due to a lack of funds.

- Charge-Offs: An account is charged-off on or before the last day of the month in which the account becomes 180 days past due. In certain circumstances, an account may be manually charged-off prior to such date subject to internal approvals. For example, in the case of a bankruptcy of the customer, Kabbage will charge-off an account within 60 days of receipt of bankruptcy filing, if not sooner.

# Regulatory

SMB Loans are originated by Celtic Bank, a Utah state chartered industrial bank insured by the Federal Deposit Insurance Corporation (FDIC) and regulated by the Utah Department of Financial Institutions and the FDIC. As a service provider to Celtic Bank, Kabbage is subject to regulation and supervision of the FDIC under the Bank Service Company Act.

Although Merchants agree that they are entering into a commercial transaction and that the proceeds of the SMB Loans will be used solely for business purposes and will not be used for personal, family, or household purposes, if the SMB Loans deemed not to constitute business loans, Kabbage could become subject to the purview of the CFPB and other additional federal and state regulatory agencies.

Kabbage and the loans originated through the Kabbage Platform must comply with applicable federal, state and local regulation including (but not limited to):

- Fair Credit Reporting Act

- Equal Credit Opportunity Act

- Bank Secrecy Act

- Service Members Civil Relief Act

- Federal Trade Commission Act

- Telephone Consumer Protection Act

- Electronic Signatures in Global and National Commerce Act

Kabbage's internal policies and procedures have been reviewed by its internal legal and compliance staff with advice in certain instances from external regulatory compliance counsel. Kabbage has built its systems and processes with controls in place in order to permit its policies and procedures to be followed on a consistent basis.

Kabbage is rated A+ by the Better Business Bureau and has received few complaints on the CFPB's website.


# Historical Performance

## Originations

Kabbage originates loans with Kabbage Scores ranging from 300 to 850. Receivables with a Kabbage Score of less than 560 will not be eligible in this transaction. Kabbage first originated 6-month loans in 2011 and 12-month loans in January 2015. As shown below, borrowers who receive a 12-month loan typically have higher Kabbage Scores than those who obtain a 6-month loan.

### 6-month Receivables

The table below displays originations for 6-month Receivables by year for 2011 through Q2 2017.



### 12-month Receivables

The table below displays originations for 12-month Receivables by quarter for Q2 2015 through Q2 2017.



**KBRA** **KROLL BOND RATING AGENCY**

# Gross Charge-Offs

The tables below show historical information relating to cumulative gross charge-offs as a percentage of original receivable balance made through the Kabbage Platform since 2011 segmented by original term and Kabbage Score. Applicants with lower Kabbage Scores have a higher probability of becoming a delinquent or defaulted receivable.

## 6-month Receivables

The table below displays gross charge-offs for 6-month Receivables since 2011 by year and by quarter for 2016.

| Gross Charge-Offs Kabbage Score | Vintage 2011 | Vintage 2012 | Vintage 2013 | Vintage 2014 | Vintage 2015 | Vintage Q1 2016 | Vintage Q2 2016 | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| 300 to 599 | 22.02% | 31.01% | 21.22% | 10.30% | 12.34% | 9.80% | 11.96% | 17.46% |
| 600 to 640 | 16.07% | 8.94% | 12.55% | 12.29% | 12.35% | 10.70% | 11.94% | 12.09% |
| 641 to 680 | 3.35% | 5.63% | 7.37% | 10.06% | 9.95% | 8.66% | 7.56% | 9.37% |
| 681 to 720 | 1.24% | 3.98% | 5.42% | 7.05% | 7.12% | 6.45% | 5.44% | 6.64% |
| 721 to 850 | 2.20% | 0.28% | 3.30% | 6.40% | 4.76% | 4.92% | 3.53% | 4.81% |
| Weighted Average* | 12.39% | 11.96% | 7.90% | 8.79% | 8.28% | 7.43% | 6.83% | 8.29% |

* Percentages are weighted by funded amount.

## 12-month Receivables

The table below displays gross charge-offs for 12-month Receivables since 2015 by quarter.

| Gross Charge-Offs Kabbage Score | Vintage Q2 2015 | Vintage Q3 2015 | Vintage Q4 2015 | Vintage Q1 2016 | Vintage Q2 2016 | Weighted Average |
|---|---|---|---|---|---|---|
| 300 to 599 | 18.88% | 10.99% | 18.83% | 16.54% | 10.27% | 15.47% |
| 600 to 640 | 14.90% | 20.10% | 13.85% | 15.11% | 10.24% | 13.49% |
| 641 to 680 | 7.81% | 9.81% | 11.45% | 11.14% | 7.93% | 10.09% |
| 681 to 720 | 9.07% | 8.32% | 8.55% | 7.35% | 6.83% | 7.65% |
| 721 to 850 | 7.43% | 4.62% | 5.20% | 5.01% | 3.73% | 4.68% |
| Weighted Average* | 8.52% | 7.74% | 8.72% | 7.74% | 6.15% | 7.52% |

* Percentages are weighted by funded amount.

Kabbage may sell charge-offs to third-parties in exchange for a small percentage of the remaining unpaid balance of Receivables. Kabbage may also outsource collections activity on charge-offs instead of selling charge-offs. Note that KBRA assumed no recoveries in its analysis of the transaction.

**KBRA** KROLL BOND RATING AGENCY

# KBRA Loss Expectation

KBRA has analyzed Kabbage's historical static pool cumulative gross charge-off data since 2011, segmented by Kabbage Score and original term in order to develop a KBRA base case loss expectation per **KBRA's General Rating Methodology for Asset-Backed Securities**:

• Kabbage Score

• Original Term

To account for limited data, KBRA analyzed publically available static pool loss data for comparable business loan and marketplace lending programs. This proxy data, in addition to Kabbage's management loss analysis, was used to help derive and validate the base case loss assumptions for each Kabbage Score range and original term.

To account for the limited data, additional stresses were applied to the KBRA base case loss assumption and multiples were stressed for each KBRA stress scenario for the applicable note rating category.

Using this analysis and assuming the Receivables migrate to the "worst case" portfolio by Kabbage Score and original term mix allowed by the Excess Concentration Amounts and Eligibility Criteria, KBRA derived a weighted average base case loss rate of approximately 10.0%.

# Cash Flow Analysis

KBRA performed a cash flow analysis to test the transaction structure and assess whether the proposed enhancement levels are sufficient to warrant the requested ratings for each of the rated Notes. KBRA did not incorporate prepayments, recoveries on charged-off loans, and assumed Kabbage is no longer the Servicer in its cash flow analysis.

In instances where a scenario is indicated by "PASS", the transaction's cash flows were sufficient to support the timely payment of interest and ultimate repayment of principal by the legal final payment date for the respective class of Notes. The multiple shown below is compared to the KBRA base case loss rate of 10.0%.

| Kabbage 2017-1:  KBRA Stress Scenario Summary | | | | | |
|---|---|---|---|---|---|
| Notes | Scenario | Gross Charge-Offs | Multiple from Base Case | Result | Preliminary KBRA Rating |
| Class A | "A" Stress | 35.0% | 3.50x | PASS | A (sf) |
| Class B | "BBB" Stress | 25.0% | 2.50x | PASS | BBB (sf) |
| Class C | "BB" Stress | 20.0% | 2.00x | PASS | BB (sf) |
| Class D | "B" Stress | 15.0% | 1.50x | PASS | B (sf) |

# Rating Sensitivity and Surveillance

KBRA's rating of the Notes represents a blended analysis of the key credit risk determinants. Events that may result in a rating change to the ABS transaction include, but are not limited to, the following:

- Changes to the Company's business strategy, management team, ownership structure or operations that cause KBRA to reassess its view of the Servicer;

- Deterioration in the transaction's asset performance that exceeds the Company's historical experience;

- Modifications of the transaction's structure or significant changes to the collateral; and

- A replacement of the Servicer.

After the initial rating is assigned, KBRA will continue to monitor the transaction until the Notes are fully repaid. Ongoing surveillance of the Notes is critical to maintaining the value of the rating. KBRA's surveillance process for securitization transactions involves a periodic review of the following:

- Servicing reports to determine if all payment obligations are met and the transaction is in compliance with all triggers and excess concentration amounts;

- Trends in collateral performance relative to historical experience; and

- The Company's financial performance and condition.

The information gathered during regular surveillance will indicate whether or not a more thorough review is warranted. Additional information may be requested if KBRA believes the credit quality of the transaction has changed from the time of the initial rating assignment or the most recent review. If warranted, KBRA will conduct an in-depth surveillance review that may result in a change to the transaction's rating and publish commentary explaining the analysis.

**KBRA** KROLL BOND RATING AGENCY

# Transaction Structure

## Legal Structure

**Transaction Structure**

The Notes are newly issued asset-backed securities collateralized by a revolving pool of receivables. The following diagram illustrates the basic securitization structure:



(1) On the closing date, the Seller will transfer receivables arising under business loans or merchant cash advances to the Issuer for cash available from the sale of the Series 2017-1 Notes or as a contribution of capital to the Issuer. From time to time thereafter, the Seller may transfer additional receivables to the Issuer for cash available from payments on the receivables owned by the Issuer, the issuances of additional Series 2017-1 Notes or other series of notes or otherwise as contributions of capital to the Issuer.

(2) The Issuer pledges the receivables it acquires from the Seller and certain other assets to the Indenture Trustee to secure its notes, including the Series 2017-1 Notes.

(3) The Issuer issues the Series 2017-1 Notes and from time to time in the future may issue additional Series 2017-1 Notes and other series of notes.

(4) The Servicer services the receivables and remits payments on the receivables received from the merchants to the collection account. The Backup Servicer will provide certain services in respect of reports generated by the Servicer and other matters and, in the event that the Servicer is terminated after a Servicer Default, will agree at the request of the Indenture Trustee (acting at the direction of the Requisite Noteholders) to act as the successor servicer.

(5) The Issuer uses collections on the receivables allocated to the Series 2017-1 Notes to make payments on the Series 2017-1 Notes and during the revolving period to purchase additional receivables from the Seller, in each case pursuant to the payment priorities described in the offering document.

For further details, see the respective offering document.

**KBRA**  KROLL BOND
RATING AGENCY

| | |
|---|---|
| **Expandable Notes** | The Notes will be "expandable" term notes such that at any time during the Revolving Period, the Issuer may periodically issue additional Series 2017-1 Notes, subject to the following conditions: |
| | (a)  such issuance does not cause the maximum issuance amount of each class to exceed certain amounts as described in the transaction documents; |
| | (b)  the rating agency condition is satisfied; |
| | (c)  the Issuer and the Receivables to be acquired by the Issuer in connection with such issuance satisfy all conditions set forth in the transaction documents; and |
| | (d)  at the time of such issuance a Rapid Amortization Event has not occurred and is not continuing. |
| | Each additional issuance of Notes will have the same terms as the corresponding Class of Series 2017-1 Notes issued on the closing date, including the same Note Rate, Legal Final Payment Date and CUSIP. |
| **Priority of Payments** | The priority of payments will generally be as follows: |
| | (1)  Fees, expenses and indemnities to service providers (up to a cap); |
| | (2)  To the Servicer, any unreimbursed servicer advances; |
| | (3)  If Kabbage is no longer the Servicer or if an Event of Default has occurred and is continuing, to the Servicer, the servicing fees; |
| | (4)  To the Backup Servicer, backup servicing fees (up to a cap); |
| | (5)  Interest on the Series 2017-1 Notes, paid sequentially; |
| | (6)  During the Series 2017-1 Revolving Period, an amount equal to the Series 2017-1 Asset Deficiency Amount, if any, to the Series 2017-1 Excess Funding Account; |
| | (7)  During the Series 2017-1 Revolving Period, the amount needed to replenish the Series 2017-1 Reserve Account, if any; |
| | (8)  After the Series 2017-1 Revolving Period, principal on the Series 2017-1 Notes, paid sequentially; |
| | (9)  Fees, expenses and indemnities to service providers (without a cap); |
| | (10) If Kabbage is the Servicer and no Event of Default has occurred and is continuing, to the Servicer, the servicing fees; |
| | (11) If Kabbage is no longer the Servicer, to the Servicer, the supplemental servicing fee; |
| | (12) All remaining funds to or at the direction of the Issuer. |
| **Revolving Period** | The transaction features a revolving period (the "Series 2017-1 Revolving Period"), which will end on the earlier of (i) the payment date occurring in the month that is 36 months after the initial closing date and (ii) the date on which a Rapid Amortization Event has occurred. |
| | There will only be one Revolving Period, and such period cannot be re-commenced or continue after it has terminated. |

| Rapid Amortization Events | The following events will be automatic "Rapid Amortization Events" with respect to the Series 2017-1 Notes:<br><br>• the occurrence of any of the following events (each a "Trigger Event") as of any payment date:<br><br>   o the three-month weighted average receivables yield on such payment date is less than 38.00%,<br>   o the three-month weighted average excess spread on such payment date is less than 8.00%; or<br>   o the three-month average delinquency ratio on such payment date is greater than 15.00%;<br><br>• an asset deficiency exists for three or more business days;<br><br>• a Servicer Default occurs;<br><br>• an Event of Default with respect to the Series 2017-1 Notes occurs under the transaction documents; or<br><br>• either the Seller or the Servicer suffers certain specified bankruptcy or insolvency events. |
|---|---|
| Events of Default | The occurrence of any of the following events will constitute an "Event of Default" under the indenture:<br><br>(a) failure to pay interest when due for five business days;<br><br>(b) failure to pay principal when due;<br><br>(c) failure by the Issuer to observe or perform any covenant or agreement in the transaction documents and that failure has a materially and adverse effect on holders of the Notes and continues or is not cured for 30 days;<br><br>(d) the receipt by the Issuer of a final determination that it will be treated as an association taxable as a corporation for federal income tax purposes;<br><br>(e) the Issuer is an "investment company" within the meaning of the Investment Company Act;<br><br>(f) certain bankruptcy or insolvency events occur with respect to the Issuer;<br><br>(g) the Indenture Trustee fails to have a valid and perfected first priority security interest in the collateral and such failure continues for five business days;<br><br>(h) the occurrence of a Receivables File Discrepancy Event; or<br><br>(i) any of the transaction documents ceases for any reason to be in full force and effect other than in accordance with its terms. |

**KBRA** KROLL BOND RATING AGENCY

| | |
|---|---|
| Excess Concentration | The Receivables are subject to certain concentration limits that, when exceeded, will be excluded from the Series 2017-1 Adjusted Pool Balance which will require the Issuer to maintain additional credit enhancement for the Notes. The Current % of Statistical Pool shown below is as of June 30, 2017. Such concentration limits are based on the amounts, without duplication, in excess of the following limits, determined as a percentage of the aggregate outstanding receivables balance of Eligible Receivables (collectively, the "Series 2017-1 Excess Concentration Amounts"): |

| Kabbage 2017-1 Excess Concentration Amounts | | |
|---|---|---|
| Concentration Amount | Kabbage 2017-1 Limit % | Current Pool % as of June 30, 2017 |
| Merchants located in California | 20.00% | 15.84% |
| Merchants located in Florida | 15.00% | 9.89% |
| Merchants located in Texas | 15.00% | 8.21% |
| Merchants located in New York | 15.00% | 7.36% |
| Merchants located in any other single state | 10.00% | 4.00% |
| Merchants with Outstanding Receivables Balances greater than $75,000 | 40.00% | 13.00% |
| Merchants with Outstanding Receivables Balances greater than $125,000 | 20.00% | 0.97% |
| Merchants in business for less than 1 year | 0.00% | 0.00% |
| Merchants in business for less than 2 years | 10.00% | 3.71% |
| Merchants in business for less than 3 years | 40.00% | 12.87% |
| Merchants in business for less than 4 years | 60.00% | 25.24% |
| Receivables with a remaining term of 7 to 18 months | 50.00% | 34.53% |
| Receivables with (a) a remaining term of 13 to 18 months and/or (b) an Outstanding Receivables Balance between $150,000.01 and $250,000.00; provided, however, that each such Receivable has a minimum Kabbage Score of 700 | 10.00% | 0.16% |
| Receivables that are 30 to 59 days past due | 8.00% | 2.22% |
| Receivables that are 60 or more days past due | 0.00% | 5.47% |
| Receivables with a Kabbage Score less than 600 | 5.00% | 1.24% |
| Receivables that are subject to Material Modifications | 5.00% | 4.97% |
| Receivables that relate to Renewal Loans | 15.00% | 0.00% |
| Merchant businesses in highest concentration industry* | 25.00% | 19.09% |
| Merchant businesses in highest 2 concentration industries* | 30.00% | 22.76% |
| Merchant businesses in highest 5 concentration industries* | 45.00% | 29.49% |
| Merchant businesses in highest 10 concentration industries* | 70.00% | 38.58% |
| Merchants that have not agreed to make payments through ACH or PayPal (or other electronic payment service) | 5.00% | 2.43% |

* Industries are classified by NAICS industry code. For purposes of this test, Receivables relating to Merchants in unclassified industries will be counted as part of a single industry.

| | |
|---|---|
| Reserve Account | The "Series 2017-1 Reserve Account" was funded on the initial closing date with $2,777,778 and will be funded on the additional notes closing date with $132,275 to maintain an amount equal to approximately 0.50% of the aggregate principal balance of the Notes divided by 94.50%. The Series 2017-1 Reserve Account will be available to pay transaction expenses and interest on the Notes. |

**KBRA** KROLL BOND RATING AGENCY

| | |
|---|---|
| Eligibility Criteria | Criteria for an "Eligible Receivable" will include, among other things, that each such receivable:<br><br>• arises in the ordinary course of the Seller's or the Credit Sponsor's business and was originated in accordance with, and conforms to, the credit policies;<br><br>• was originated by the Seller or the Credit Sponsor in compliance with all applicable laws and regulations and remains in compliance with all applicable laws and regulations;<br><br>• is due from an Eligible Merchant;<br><br>• is not (i) 60-days past due or (ii) if the acquisition of such Receivable by the Issuer would result in any excess concentration limitation applicable to 30-days past due receivables to be exceeded, 30-days past due;<br><br>• is denominated in U.S. dollars;<br><br>• if such Receivable has an original principal amount that exceeds $250,000, then only $250,000 will be eligible;<br><br>• is a monthly (or more frequent pay) receivable;<br><br>• has an original term less than or equal to 18 months;<br><br>• does not have a maturity date later than six months prior to the earliest legal final maturity date of any series of Notes outstanding;<br><br>• has a receivable yield greater than or equal to 19.00% per annum;<br><br>• together with all other Eligible Receivables, has a weighted average receivables yield of at least 38.00% per annum;<br><br>• together with all other Eligible Receivables, has a weighted average remaining term of no more than 13 months;<br><br>• has received Kabbage Score of no less than 560;<br><br>• has received a FICO score of no less than 539;<br><br>• relates to Merchants with a weighted average Kabbage Score of 675 or greater as of the date of its underwriting; and<br><br>• if has an 18-month original term, then such Receivable has (i) a Kabbage Score of at least 700, (ii) the related Merchant has been in business for at least 3 years and (iii) the related Merchant has annual gross revenue of at least $150,000 per annum. |
| Eligible Merchant | Criteria for an "Eligible Merchant" will include, among other things, that each such receivable:<br><br>• is domiciled in the United States;<br><br>• is not subject to any proceedings under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect and<br><br>• is a business that has been operating for at least one year. |

| | |
|---|---|
| Servicer Defaults | The occurrence of any of the following events will constitute a "Servicer Default" under the servicing agreement:<br><br>(a)  the Servicer fails to make any payment, transfer or deposit to the Indenture Trustee on the date that payment, transfer or deposit was due and such failure shall continue for five business days;<br><br>(b)  any representation or warranty made by the Servicer in the servicing agreement or in any statement or certificate at any time given by the Servicer in writing pursuant to the transaction documents is incorrect when made and such inaccuracy has a material and adverse effect on the interests of the holders of the Notes and such inaccuracy is not cured for a period of 30 consecutive days;<br><br>(c)  any failure by the Servicer to comply with any of its agreements or covenants contained in the transaction documents and such failure has a material and adverse effect on the interests of the holders of the Notes and such failure is not cured for a period of 30 consecutive days;<br><br>(d)  certain bankruptcy or insolvency events shall have occurred with respect to the Servicer;<br><br>(e)  the three-month average excess spread on such payment date is less than 8.00%; or<br><br>(f)  the three month average delinquency ratio on such payment date is greater than 15.00%. |
| Representations and Warranties | For more detailed information regarding the representations, warranties and enforcement mechanisms available under the transaction documents, please see KBRA's Kabbage Asset Securitization LLC, Series 2017-1 Representations and Warranties Disclosure available **here**. |

**KBRA** **KROLL BOND RATING AGENCY**

© Copyright 2017, Kroll Bond Rating Agency, Inc., and/or its licensors and affiliates (together, "KBRA"). All rights reserved. All information contained herein is proprietary to KBRA and is protected by copyright and other intellectual property law, and none of such information may be copied or otherwise reproduced, further transmitted, redistributed, repackaged or resold, in whole or in part, by any person, without KBRA's prior express written consent. Ratings are licensed by KBRA under these conditions. Misappropriation or misuse of KBRA ratings may cause serious damage to KBRA for which money damages may not constitute a sufficient remedy; KBRA shall have the right to obtain an injunction or other equitable relief in addition to any other remedies. The statements contained in this report are based solely upon the opinions of KBRA and the data and information available to the authors at the time of publication of this report. All information contained herein is obtained by KBRA from sources believed by it to be accurate and reliable; however, KBRA ratings are provided "AS IS". No warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability, or fitness for any particular purpose of any rating or other opinion or information is given or made by KBRA. Under no circumstances shall KBRA have any liability resulting from the use of any such information, including without limitation, for any indirect, special, consequential, incidental or compensatory damages whatsoever (including without limitation, loss of profits, revenue or goodwill), even if KBRA is advised of the possibility of such damages. The credit ratings, if any, and analysis constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. KBRA receives compensation for its rating activities from issuers, insurers, guarantors and/or underwriters of debt securities for assigning ratings and from subscribers to its website.

**KBRA** KROLL BOND
RATING AGENCY

**Structured Finance**

ABS New Issue Report

# Kabbage Asset Securitization LLC, Series 2017-1 Second Additional Notes

**$60 Million Additional Issuance under the "expandable" terms of the Series 2017-1 Notes**

**$610 Million aggregate, including previously issued $550 Million Series 2017-1 Notes**



**Analytical Contacts:**

Alan Greenblatt, Director
agreenblatt@kbra.com, (646) 731-2496

Lenny Giltman, Managing Director
lgiltman@kbra.com, (646) 731-2378

Anthony Nocera, Senior Managing Director
anocera@kbra.com, (646) 731-2350

Chris Baffa, Associate Director
cbaffa@kbra.com, (646) 731-3312

## Table of Contents

Executive Summary ........................................................................................................................ 3

   Transaction Overview ........................................................................................................... 3

   Key Credit Considerations .................................................................................................... 5

Key Changes from prior 2017-1 Note Issuance .......................................................................... 11

Performance of Current Securitization ...................................................................................... 12

KBRA Process ........................................................................................................................... 12

Transaction Summary ............................................................................................................... 14

Seller and Servicer ................................................................................................................... 16

   Company Overview ............................................................................................................. 16

   Management ....................................................................................................................... 16

   Originations ........................................................................................................................ 18

   Underwriting ....................................................................................................................... 19

   Financial Condition and Liquidity ........................................................................................ 20

   Servicing ............................................................................................................................. 20

   Regulatory .......................................................................................................................... 21

Historical Performance .............................................................................................................. 22

   Originations ........................................................................................................................ 22

   Gross Charge-Offs .............................................................................................................. 23

KBRA Loss Expectation ............................................................................................................ 24

Cash Flow Analysis ................................................................................................................... 24

Rating Sensitivity and Surveillance ........................................................................................... 25

Transaction Structure ............................................................................................................... 26

# Executive Summary

This transaction report is based on information regarding the underlying collateral pool and the terms of the securitization as of May 17, 2018. The ratings listed below are for $60 million in additional issuance under the "expandable" terms of the Kabbage Asset Securitization LLC, Series 2017-1 Notes. In addition, the ratings for the previously issued $550 million of Series 2017-1 Notes will be confirmed in conjunction with the issuance of the $60 million Series 2017-1 Additional Notes. The ratings listed below for the $60 million Series 2017-1 Additional Notes are final. The ratings for the $550 million previously issued Series 2017-1 Notes are final. This report does not constitute a recommendation to buy, hold, or sell securities.

| Rated Notes - $60 Million Series 2017-1 Additional Notes | | | | | | |
|---|---|---|---|---|---|---|
| Notes | Initial Principal Balance | Note Rate | Advance Rate | Initial Credit Enhancement* | Legal Final Payment Date | KBRA Rating |
| Class A | $44,444,000 | 4.571% | 70.00% | 30.50% | March 2022 | A (sf) |
| Class B | $9,525,000 | 5.794% | 85.00% | 15.50% | March 2022 | BBB (sf) |
| Class C | $3,174,000 | 8.000% | 90.00% | 10.50% | March 2022 | BB (sf) |
| Class D | $2,857,000 | 10.000% | 94.50% | 6.00% | March 2022 | B (sf) |
| Total: | $60,000,000 | | | | | |

* Initial credit enhancement shown above includes overcollateralization, subordination and the Series 2017-1 Reserve Account.

| Rated Notes - $550 Million Previously Issued Series 2017-1 Notes | | | | | | | |
|---|---|---|---|---|---|---|---|
| Notes | Initial Principal Balance | Note Rate | Advance Rate | Initial Credit Enhancement[1] | Legal Final Payment Date | KBRA Rating | Action |
| Class A[2] | $407,407,000 | 4.571% | 70.00% | 30.50% | March 2022 | A (sf) | Confirm |
| Class B[3] | $87,301,000 | 5.794% | 85.00% | 15.50% | March 2022 | BBB (sf) | Confirm |
| Class C[4] | $29,101,000 | 8.000% | 90.00% | 10.50% | March 2022 | BB (sf) | Confirm |
| Class D[5] | $26,191,000 | 10.000% | 94.50% | 6.00% | March 2022 | B (sf) | Confirm |
| Total: | $550,000,000 | | | | | | |

(1) Initial credit enhancement shown above includes overcollateralization, subordination and the Series 2017-1 Reserve Account.
(2) Class A Notes were Assigned on 3/20/2017 with an initial principal balance of $388,889,000. Additional Class A Notes were Assigned on 8/28/2017 with an initial principal balance of $18,518,000.
(3) Class B Notes were Assigned on 3/20/2017 with an initial principal balance of $83,333,000. Additional Class B Notes were Assigned on 8/28/2017 with an initial principal balance of $3,968,000.
(4) Class C Notes were Assigned on 3/20/2017 with an initial principal balance of $27,778,000. Additional Class C Notes were Assigned on 8/28/2017 with an initial principal balance of $1,323,000.
(5) Class D Notes were Assigned on 3/20/2017 with an initial principal balance of $25,000,000. Additional Class D Notes were Assigned on 8/28/2017 with an initial principal balance of $1,191,000.

## Transaction Overview

Kabbage Asset Securitization LLC (the "Issuer") issued $525 million of Series 2017-1 Class A, Class B, Class C and Class D Notes on March 20, 2017 and subsequently issued $25 million of additional Series 2017-1 Class A, Class B, Class C, and Class D Notes on August 28, 2017 (collectively, the "Series 2017-1 Notes"). The Issuer issued $60 million of additional Series 2017-1 Class A, Class B, Class C and Class D Notes (collectively, the "Series 2017-1 Additional Notes", together with the Series 2017-1 Notes, the "Notes"). The Series 2017-1 Additional Notes will have the same terms as the corresponding classes of Series 2017-1 Notes, including same Note Rate, Advance Rate and Legal Final Payment Date. The proceeds of the sale of the Series 2017-1 Additional Notes will be used to provide extra funding capacity for Kabbage.

**KBRA**  **KROLL BOND RATING AGENCY**

Founded in 2009, Kabbage is a financial technology company that uses its proprietary risk scoring models, transactional data, technology systems and platform to provide fully automated, online access to business loans (the "SMB Loans") for small- and medium-sized businesses ("Merchants"). Kabbage has also provided working capital to Merchants by purchasing a specified amount of a Merchant's future receivables known as merchant cash advances ("MCAs"). None of the receivables in the pool consist of MCAs. The Kabbage business loan program (the "Kabbage Program") is offered via Kabbage's automated loan application, underwriting and servicing platform (the "Kabbage Platform").

The Kabbage Platform currently allows Merchants to access uncommitted business lines of credit up to $250,000 for a 6-, 12- or 18- month installment loan issued by Celtic Bank, a Utah chartered industrial bank, member FDIC ("Celtic Bank"). A business approved under the Kabbage Program can draw on the line up to the credit limit as needed, however Kabbage can cut off the borrower's ability to draw on the business line for a variety of reasons including missed payments. Loans in excess of 18 months or $250,000 will not be included in this transaction. The average original receivables balance per Receivable and weighted average original term in the pool is $8,419 and 9.7 months, respectively, as of March 31, 2018.

The SMB Loan or MCA borrowed by the Merchant is repaid in equal principal payments over the original term of the loan with interest charges based on the initial borrowed amount. Each loan will have a "big fee" (typically 1% to 10%) for the first 2 months for 6-month loans and the first 6 months for 12-month loans, as well as a 1%-1.25% "small fee", for the remaining term of the loan. For the 18-month loans the "big fee" will be for the first 10 months.

The Notes will be secured by a revolving pool of receivables (the "Receivables" or the "Portfolio") consisting of (i) SMB Loans or (ii) MCAs. The transaction features a revolving period (the "Revolving Period"), which will end on the earlier of (i) the payment date occurring in the month that is 36 months after the initial closing date and (ii) the date on which a Rapid Amortization Event has occurred.

The Notes will be "expandable" term notes such that at any time during the Revolving Period, the Issuer may periodically issue additional Notes, so long as certain conditions are met, including receipt of rating agency confirmation. The consent of existing noteholders will not be required for these additional issuances, and investors should note that any additional note issuance would dilute the control and vote of existing noteholders.

As of March 31, 2018, the pool of receivables had an aggregate outstanding receivables balance of $575,849,084.76.

| Transaction Parties | |
|---|---|
| Issuer | Kabbage Asset Securitization LLC |
| Seller and Servicer | Kabbage, Inc. |
| Platform | www.kabbage.com |
| Initial Backup Servicer | First Associates Loan Servicing, LLC |
| Indenture Trustee and Custodian | U.S. Bank National Association |
| Originator / Credit Sponsor / Funding Bank | Celtic Bank, a Utah chartered industrial bank |
| Administrator | CBIZ MHM LLC |
| Initial Purchasers | Guggenheim Securities, LLC and Credit Suisse Securities (USA) LLC |

**KBRA** KROLL BOND RATING AGENCY

## Key Credit Considerations

### Strength of the Seller and Servicer

Founded in 2009, Kabbage is a financial technology company that uses financial services data and technology platform to provide business loans to Merchants. Since inception, Kabbage has funded over $4.5 billion for over 135,000 customers. As of April 30, 2018, the Company has 412 employees with offices in Atlanta, San Francisco, New York, Ireland and India. Members of the senior management team have over 20 years of experience in payment processing, financial services and/or small business marketplace lending.

Kabbage previously sponsored a securitization in September 2014 which was rated by KBRA and performed in line with expectations. The 2014 transaction was refinanced in March 2017, and subsequently the ratings were withdrawn. KBRA believes Kabbage has an experienced management team and the operational capabilities to service the Portfolio.

During the fourth quarter of 2017, Kabbage closed a $250 million equity investment from a subsidiary of SoftBank Group Corp. and an asset-backed, revolving credit facility with Credit Suisse for up to $200 million. These additional funding sources have allowed Kabbage to expand its lending products for small- and medium-sized businesses, to accelerate its software as a service platform business and to explore other strategic opportunities for its small- and medium-sized businesses customers.

On April 20, 2018, Kabbage entered into a definitive agreement to acquire substantially all of the assets of Orchard App Inc. ("Orchard"), which will allow Kabbage to interpret Orchard's technology platform for enhanced data capabilities.

### Transaction Structure

KBRA believes the transaction has sufficient credit enhancement, along with a structure that accelerates principal payments on the Notes upon a deterioration of asset performance to support the rating on the Notes.

Key credit enhancements will consist of:

- Excess Cash Flow:
  - The weighted average receivables yield of the pool of receivables is approximately 42.98%, which should result in significant excess spread over the coupons of the Notes and monthly fees and expenses. Regarding additional receivables to be purchased by the Issuer during the Revolving Period, the transaction documents require that the weighted average receivables yield for the entire pool to be at least 38.00% per annum and the receivables yield on any individual receivable to be at least 19.00% per annum.

  - Monthly distributions of principal pursuant to the priority of payments will include a yield supplement amount.

**KBRA** KROLL BOND RATING AGENCY

## Key Credit Considerations

- Subordination:

  - Initial subordination for the Class A Notes is 30.00%, for the Class B Notes is 15.00%, for the Class C Notes is 10.00% and for the Class D Notes is 5.50%.

  - Each junior class of Notes will be subordinated in right of payment to each class of Notes that is senior.

- Reserve Account: Currently funded with $2,910,053 and will be additionally funded on the additional notes closing date with $317,461 to maintain an amount equal to approximately 0.50% of the aggregate outstanding principal balance of the Notes divided by 94.50% (the "Series 2017-1 Required Reserve Account Amount").

- Trigger Events: Occurrence of any of the following events will cause principal payments on the Notes to be accelerated (with payments occurring sequentially):

  - the three-month weighted average receivables yield on such payment date is less than 38.00%;

  - the three-month weighted average excess spread on such payment date is less than 8.00%; or

  - the three-month average delinquency ratio on such payment date is greater than 15.00%.

- Servicing Fee: If Kabbage is the Servicer, the servicing fee is payable after interest and principal on the Notes, however KBRA assumed Kabbage is no longer the Servicer in its cash flow analysis.

Additional information is included in the **Transaction Structure** section.

### Revolving Period and Prefunding Feature

When the initial transaction closed in March 2017 it featured a 36-month revolving period (the "Revolving Period"), which currently has 22 months remaining, during which time no payments of principal of the Notes will be made unless the Issuer elects to prepay the Notes in full on or after the payment date in March 2019. Cash flow from principal collections may be reinvested to purchase additional receivables, based on certain eligibility requirements. The existence of the Revolving Period adds uncertainty to the Portfolio composition and could allow the Portfolio to become more concentrated and vary somewhat from the additional notes closing date.

On the additional notes closing date, the transaction may only contain (but not less than) 85% of the Targeted Closing Receivables Balance. If 100% of the Target Closing Receivables Balance isn't transferred on the additional notes closing date, an amount (the "Prefunded Amount"), if any, will be deposited into the Series 2017-1 Excess Funding Account, which amounts will be available for the purchase of additional Receivables. The remaining Receivables are expected to be transferred to the Issuer during the next three to six weeks after closing.

All additional receivables must satisfy the eligibility criteria described further in the offering document and within the **Transaction Structure** section. KBRA has assumed that the cash flow will be reinvested to the "worst case" Portfolio permitted within the transaction's eligibility requirements.

**KBRA** KROLL BOND
RATING AGENCY

## Key Credit Considerations

**Portfolio Remaining Term**

The pool of receivables has an initial weighted average remaining term of approximately 6.2 months. There are restrictions when adding additional receivables that such receivable, together with all other Eligible Receivables, has a weighted average remaining term of no more than 13 months. In addition, Excess Concentration Amounts limit 50% of the Portfolio to have a remaining term greater than 6 months or more and further limit 10% of the Portfolio to have a remaining term greater than 12 months or more. The shorter remaining term allows for less time for an obligor default to occur. KBRA recognizes the tenor of the loans could create potential stress or affordability issues for the obligors due to the high rates and short term nature of the loans. KBRA has addressed this concern in its analysis of the historical performance of the loans and the cash flow analysis within.

**+ / −**

**Limited Performance Data for Longer Loan Terms**

Kabbage has limited operating history on its 12-month and 18-month loans that may be included in the Portfolio. Kabbage first originated 6-month loans in 2011 and 12-month loans in January 2015. Kabbage recently started originating 18-month loans in October 2017.

Loans with remaining terms of 12 months can be up to 50% of the Portfolio, with a sublimit of loans with remaining terms of 18 months up to 10% of the Portfolio. To account for the limited data, additional stresses were applied to the KBRA base case assumption and loss multiples were stressed for each note rating category.

**−**

**Internet Lending**

Internet-based lending is inherently riskier than in-person lending as there is a greater potential for falsification of information and borrower fraud. Applicants may also misrepresent their intentions regarding loan purpose or treat their obligations on the loans originated through the internet as having less significance and a lower payment priority to those loans originated through traditional lending sources where they may have other business relationships. Therefore, an online lender needs to possess adequate internal controls and robust fraud detection procedures.

Kabbage uses identity and fraud checks analyzing data provided by external databases to authenticate each borrower's identity. Any loans that were originated to customers with verifiable identity theft or fraud must be repurchased by Kabbage. KBRA believes Kabbage possesses adequate resources and procedures for information verification and fraud detection.

**+ / −**



## Key Credit Considerations

**Regulatory Environment for Online Lenders**

The online lending industry was a high-growth, high-profile sector that has attracted the attention of various regulators and the regulatory oversight of securities and capital markets. Although there have not been any statutory or regulatory requirements imposed specifically on online lenders to date, in 2015, the U.S. Treasury Department issued a request for information on online lending. The Treasury Department received a large number of responses from a variety of stakeholders. In May 2016, the US Treasury Department released its response in a white paper titled "Opportunities and Challenges in Online Marketplace Lending". In response to the white paper, Kabbage has incorporated into their merchant agreements a comparison tool called the SMART (Straightforward Metrics Around Rate and Total Cost) Box. The SMART Box is focused on empowering small businesses to better assess and compare finance options as well as advance small business online lending education and transparency.

Furthermore, in December 2015, the California Department of Business Oversight launched an inquiry into 14 online lenders, including Kabbage. In May 2016, the New York Department of Financial Services requested information from 28 online lending companies. There is a possibility that Kabbage's business may become subject to additional or different regulations in the future.

Although Merchants agree that they are entering into a commercial transaction and that the proceeds of the SMB Loans will be used solely for business purposes and will not be used for personal, family, or household purposes, if the SMB Loans are deemed not to constitute business loans, Kabbage could become subject to the purview of the CFPB and other additional federal and state regulatory agencies. Such additional regulatory scrutiny and potential additional regulation could impose specific statutory liability on creditors who fail to comply with the provisions of applicable laws and regulations.

On April 9, 2018, Kabbage received a letter from the Vermont Department of Financial Regulations ("DFR") requesting that it suspend all business loan solicitation activities in the State of Vermont and provide evidence that it is licensed, exempt from, or in compliance with Vermont's licensing statutes. Kabbage believes that it is exempt from Vermont's loan solicitation licensing requirements because it engages in solicitation activities solely as a service provider to Celtic Bank pursuant to the Program Management Agreement. Pending a satisfactory resolution of this matter, Kabbage and Celtic Bank have suspended access to SMB Loans by Vermont businesses and Kabbage has ceased all marketing and sales outreach activities in Vermont. As of March 31, 2018, the aggregate Outstanding Receivables Balance of Pooled Receivables involving Merchants located in Vermont comprised approximately 0.17% of the Pool Outstanding Receivables Balance.

KBRA anticipates this regulatory scrutiny will continue over the next few years but believes that Kabbage is proactively seeking to address any regulatory concerns and promote transparency in its lending platform operations.

**-/+**



## Key Credit Considerations

### Challenges to Exportation of State Usury Laws and True Lender Issues

Loans from the Kabbage Platform are currently originated by Celtic Bank, a Utah chartered industrial bank. Federal law generally permits the exportation of usury laws in effect in the state in which the bank is organized to a borrower's state. Recently, however, some courts have ruled that Federal preemption of state interest caps would not apply in some circumstances. In May 2015, for instance, the Second Circuit ruled in *Madden v. Midland Funding* that a non-bank purchaser of charged-off credit card loans cannot rely on state law preemption to charge interest rates that exceeded the usury limit in New York. Although the *Madden* ruling only applies to New York, Connecticut and Vermont, and it only addressed a consumer credit product, it is possible similar decisions could be adopted by courts in other jurisdictions or that other courts or regulators could choose to review small business loans in the context of usury or true lender issues in a manner akin to the scrutiny given consumer credit products.

Kabbage believes the legal structure underlying Kabbage's relationship with Celtic Bank is distinguishable from the structure in the *Madden* case. Furthermore, Kabbage believes it is unlikely that courts or regulators would apply the same level of scrutiny afforded to consumer credit products as it would to Kabbage's credit products considering Kabbage's underwriting processes. To date, no actions have been taken or threatened against Kabbage on the theory that it has engaged in unauthorized lending or loan brokering through its relationship with Celtic Bank.

In November 2017, a purported class action was filed against Kabbage, among other defendants, alleging that Kabbage offered usurious loans through Celtic Bank and alleging other violations of federal and state laws related to Kabbage's bank partnership model. Kabbage has entered into a joint defense agreement with Celtic Bank. The claims against one of the co-defendants have been settled and Kabbage and Celtic Bank intend to seek to resolve the matter in arbitration. Kabbage believes that the case is without merit and intends to vigorously defend the action, however, it can offer no assurance as to the ultimate outcome of such proceeding.

**-**

### Relationship with Celtic Bank

Celtic Bank is currently the primary issuing bank for all receivables originated through the Kabbage Platform. Kabbage has agreed to purchase all receivables associated with such SMB Loans, which receivables represent an undivided ownership interest in up to 100% of all amounts due or to become due by the Merchants under the related agreement. The transaction documents allow Kabbage to contract with another funding bank ("Credit Sponsor") to originate receivables to be sold to the Issuer during the Revolving Period without noteholder consent, although rating agency confirmation would be required.

The agreement between Kabbage and Celtic Bank is scheduled to terminate in March 2022 but is subject to automatic renewal for successive one year terms. The agreement with Celtic Bank is not exclusive and does not prohibit Celtic Bank from working with competitors of Kabbage or prohibit Kabbage from potentially entering into bank relationships with other Credit Sponsors.

**+/-**

## Key Credit Considerations

**Third Party Due Diligence Review**

CBIZ MHM LLC ("CBIZ" or the "Administrator") will be engaged to provide certain reporting services both monthly and annually, which will include, among other items:

*Monthly Services*:

- Recalculate certain data fields,

- Calculate the total interest due for the Notes;

- Calculate the Receivables pool balance;

- Calculate the ineligibles total amounts and the over concentration total amounts;

- Calculate the 94.50% of the Receivables adjusted pool balance;

- Calculate the asset deficiency amount; and

- Review a sample of 100 Receivables and compare, confirm or calculate, as applicable, 15 data fields (the "Receivables File Review").

In connection with each Receivables File Review, if the sample error rate of any of the data fields exceeds 4%, then the Administrator will notify the respective service providers of the data integrity discrepancy (a "Receivables File Discrepancy Event") and 200 Receivables will be sampled by the Administrator the following month. If based on the results of the 200 Receivables tested in the following month results in a data field exceeding 4%, a Receivables File Discrepancy Event and an Event of Default will occur under the Indenture.

*Annual Services*:

- Management discussion and overview,

- Underwriting/credit approval summary,

- Servicing and collections summary and

- Internal, external and regulatory audit and systems review.



# Key Changes from prior Series 2017-1 Additional Notes Issuance

Summarized below are the key changes which occurred since the August 28, 2017 issuance of additional Series 2017-1 Notes.

| Company and Operations | |
|---|---|
| Liquidity | During the fourth quarter of 2017, Kabbage closed a $250 million equity investment from a subsidiary of SoftBank Group Corp. and an asset-backed, revolving credit facility with Credit Suisse for up to $200 million. |
| Orchard Acquisition | On April 20, 2018, Kabbage entered into a definitive agreement to acquire substantially all of the assets of Orchard App Inc., which will allow Kabbage to interpret Orchard's technology platform for enhanced data capabilities. |
| Celtic Bank Agreement | An updated agreement between Kabbage and Celtic Bank was finalized, this agreement is now scheduled to terminate in March 2022. |
| Management Update | Mr. James Chou was hired as chief technology officer at Kabbage. Mr. Chou has more than 20 years of experience leading technology operations for enterprise software companies. Mr. Robert Sharpe also joined as Chief Operating Officer of Kabbage. Mr. Sharpe has more than 30 years of executive leadership experience in North America, Europe and Asia. |
| Vermont Regulatory Inquiry | In April 2018, the State of Vermont asked Kabbage to provide evidence that it is licensed, exempt from, or in compliance with Vermont's licensing statutes. Pending a satisfactory resolution of this matter, Kabbage and Celtic Bank have suspended access to SMB Loans by Vermont based businesses and Kabbage has ceased all marketing and sales outreach activities in Vermont at the request of the Vermont Department of Financial Regulations. Merchants located in Vermont comprised approximately 0.17% of the Pool Outstanding Receivables Balance as of March 31, 2018. |
| Material Litigation | In November 2017, a purported class action was filed against Kabbage, among other defendants, alleging that Kabbage offered usurious loans through Celtic Bank and alleging other violations of federal and state laws related to Kabbage's bank partnership model. Kabbage has entered into a joint defense agreement with Celtic Bank. The claims against one of the co-defendants have been settled and Kabbage and Celtic Bank intend to seek to resolve the matter in arbitration. |
| Collateral | |
| Inclusion of 18-month loans | In October 2017, Kabbage started originating 18-month loans. The transaction has a 10% concentration limit on the 18-month loan product. As of March 31, 2018, the company has originated $3.5 million of 18-month loans of which there is $2.4 million outstanding in the pool. |

**KBRA** KROLL BOND RATING AGENCY

# Performance of Current Securitization

The Kabbage Asset Securitization LLC, Series 2017-1 transaction performance is in-line with KBRA's base case scenario and is still within its reinvestment period during which time principal collections have been reinvested into additional eligible receivables. Since the transaction closed, all timely interest has been paid to investors. Additionally, No Rapid Amortization Event has occurred.

| Rapid Amortization Events with respect to the Series 2017-1 Notes | | |
|---|---|---|
| **Trigger Events** | **As of April 2018 Payment Date** | **Status** |
| a)  occurrence of any of the following events: | | |
|    i)  Three-Month Weighted Average Receivables Yield less than 38.00%? | 46.4% | Pass |
|    ii)  Three-Month Weighted Excess Spread less than 8.00%? | 16.7% | Pass |
|    iii)  Three-Month Average Delinquency Ratio greater than 15.00%? | 9.7% | Pass |
| b)  existence of a Series 2017-1 Asset Deficiency for three (3) or more business days? | No | Pass |
| c)  occurrence of a Servicer Default? | No | Pass |
| d)  occurrence of an Event of Default with respect to the Series 2017-1 Notes under the Transaction Documents? | No | Pass |
| e)  occurrence of certain specified bankruptcy or insolvency events of either the Seller of the Servicer? | No | Pass |

The following charts show how the transaction has performed over time with regard to the Trigger Event metrics:







# KBRA Process

KBRA analyzed the transaction using the **Global General Rating Methodology for Asset-Backed Securities** published on November 28, 2017. The transaction falls within Category 1 – Financial Assets, which typically relates to transactions that are backed by pools of consumer or commercial financial obligations owed by diverse obligors with payment terms that fully pay interest and principal on the Asset-Backed Securities.

KBRA's general methodology incorporates an analysis of: (1) the underlying collateral pool, (2) the platform's historical static pool data, segmented by characteristics including credit quality and product type, (3) the proposed capital structure for the transaction, (4) KBRA's operational assessment of the platform and servicer, and (5) the legal structure, transaction documents, and legal opinions.

KBRA has performed an on-site operational review of the Company at their Atlanta, GA headquarters and has met with the Company for updates. In addition, KBRA conducted phone interviews with a representative from Celtic Bank to discuss its underwriting process and arrangement with Kabbage.

# Transaction Summary

The table below summarizes the characteristics of the pool as of March 31, 2018 as compared to the characteristics of the Statistical Pool as of December 31, 2016 for the original Series 2017-1 Note issuance.

| Kabbage Asset Securitization LLC, Series 2017-1 | | |
|---|---|---|
| **Collateral Stratification** | **March 31, 2018** | **December 31, 2016** |
| Number of Receivables | 112,734 | 97,529 |
| Number of Merchants | 41,395 | 29,311 |
| Average Number of Receivables per Merchant | 2.7 | 3.3 |
| Pool Outstanding Receivables Balance | $575,849,085 | $442,434,678 |
| Average Outstanding Receivables Balance per Receivable | $5,108 | $4,536 |
| Maximum Outstanding Receivables Balance per Receivable | $232,917 | $100,000 |
| Average Outstanding Receivables Balance per Merchant | $13,911 | $15,094 |
| Maximum Outstanding Receivables Balance per Merchant | $236,575 | $150,035 |
| Aggregate Original Receivables Balance | $949,219,443 | $730,121,187 |
| Average Original Receivables Balance per Receivable | $8,420 | $7,486 |
| Average Original Receivables Balance per Merchant | $22,931 | $24,909 |
| Weighted Average Receivable Yield at Origination | 42.98% | 41.11% |
| Weighted Average Original Term (months) | 9.7 | 9.0 |
| Weighted Average Remaining Term (months) | 6.2 | 7.7 |
| Weighted Average Age (months) | 3.9 | 2.2 |
| Weighted Average FICO Score | 696 | 692 |
| Weighted Average Kabbage Score | 702 | 698 |
| Weighted Average Time in Business (years) | 10.6 | 9.2 |
| **Range of Remaining Term to Maturity Distribution** | | |
| Up to 6 months | 56.63% | 59.03% |
| 7 to 12 months | 42.95% | 37.19% |
| 13 or more months | 0.42% | 3.79% |
| **Original Term to Maturity Distribution** | | |
| 6 months | 39.36% | 49.33% |
| 12 months | 60.22% | 50.67% |
| 18 months | 0.42% | 0.00% |
| **Range of Kabbage Score Distribution** | | |
| 560 to 599 | 0.75% | 1.22% |
| 600 to 649 | 6.67% | 8.62% |
| 650 to 699 | 31.66% | 36.62% |
| 700 to 749 | 59.90% | 53.01% |
| 750 to 799 | 0.97% | 0.51% |
| 800 to 850 | 0.06% | 0.02% |
| **Geographic Concentration** | | |
| Largest State | California:  16.28% | California:  15.80% |
| Second Largest State | Florida:  9.67% | Florida:  10.43% |
| Third Largest State | Texas:  8.02% | Texas:  7.94% |

In addition, the Receivables must satisfy the Eligibility Criteria further described in the offering document and within the Transaction Structure section.

**KBRA** KROLL BOND RATING AGENCY

The table below summarizes the credit enhancement structure of this transaction. The balances of the classes below include $555,000,000 of previously issued Series 2017-1 Notes and $60,000,000 of Series 2017-1 Additional Notes that will be issued on the additional notes closing date.

| Kabbage Asset Securitization LLC | |
|---|---|
| **Transaction Structure** | |
| Class A Balance | $451,851,000 |
| Class B Balance | $96,826,000 |
| Class C Balance | $32,275,000 |
| Class D Balance | $29,048,000 |
| Total Balance | $610,000,000 |
| Class A Advance Rate / Initial CE[1] | 70.00% / 30.50% |
| Class B Advance Rate / Initial CE[1] | 85.00% / 15.50% |
| Class C Advance Rate / Initial CE[1] | 90.00% / 10.50% |
| Class D Advance Rate / Initial CE[1] | 94.50% / 6.00% |
| Reinvestment Period[2] | 36 months |
| Remaining Reinvestment Period | 22 months |
| Reserve Account | 0.50% |
| **KBRA Ratings** | |
| Class A | A (sf) |
| Class B | BBB (sf) |
| Class C | BB (sf) |
| Class D | B (sf) |
| **KBRA Base Case Loss Expectation** | |
| KBRA Base Case Loss Range | 9.00% - 11.00% |

[1] Initial credit enhancement (CE) shown only includes overcollateralization, subordination and the Series 2017-1 Reserve Account.

[2] 36 month Revolving period as of the initial closing date on March 20, 2017. There are currently 22 months left in the revolving period.

**KBRA** **KROLL BOND RATING AGENCY**

# Seller and Servicer

## Company Overview

Founded in 2009, Kabbage is a financial technology company that uses its proprietary risk scoring models, transactional data, technology systems and platform to provide fully automated, online access to business loans (the "SMB Loans") for small- and medium-sized businesses ("Merchants"). Kabbage has also provided working capital to Merchants by purchasing a specified amount of a Merchant's future receivables known as merchant cash advances ("MCAs"). The Kabbage business loan program (the "Kabbage Program") is offered via Kabbage's automated loan application, underwriting and servicing platform (the "Kabbage Platform").

The Kabbage Platform allows Merchants to access uncommitted business lines of credit up to $250,000 for a 6-, 12-, or 18- month installment loan issued by Celtic Bank, a Utah chartered industrial bank, member FDIC ("Celtic Bank"). Initially, the Kabbage Program offered a 6-month term product and in January 2015, the Kabbage Program began offering a 12-month term product. Kabbage began offering the 18-month term product this year in October 2017. Kabbage also licenses its Kabbage Platform to financial institutions and other organizations across the globe.

Under the Kabbage Program, Celtic Bank underwrites, originates and funds the SMB Loans while Kabbage serves as the program manager providing marketing, origination, application processing, loan servicing and collection services for all loans. Under an agreement with Celtic Bank, Kabbage purchases the right to all of the loan payments and other receivables associated with such SMB Loans. Celtic Bank retains title to the underlying SMB Loans through maturity but has agreed to transfer title under certain circumstances.

Since inception, Kabbage has funded over $4.5 billion for over 140,000 customers through the Kabbage Platform. The Company has over 412 employees with offices in Atlanta, San Francisco, New York, Ireland and India.

## Management

During 2016, KBRA met with Kabbage's management team, including those responsible for credit, business development, finance and operations. Since the initial closing date, Kabbage's management team has had some changes and KBRA has met with some of those members as well. Members of the senior management team have over 20 years of experience in the payment processing, financial services and/or small business marketplace.

**Rob Frohwein, Chief Executive Officer**

Mr. Rob Frohwein is the Chief Executive officer and co-founder of Kabbage. Prior to Kabbage, Mr. Frohwein was CEO of LAVA Group, Inc., an intellectual property and technology investment bank. Prior to LAVA Group, Mr. Frohwein held the positions of senior vice president, business development and general counsel of ZapMedia, vice president of strategic alliances and general counsel of Security First Network Bank, and an attorney with Troutman Sanders LLP, an international law firm. Mr. Frohwein is a graduate of Villanova Law School and studied economics at Dickinson College in Carlisle, PA.

**KBRA** **KROLL BOND RATING AGENCY**

**Kathryn Petralia, President**

Ms. Kathryn Petralia is the President and co-founder of Kabbage. She has spent the past 20 years working with both startups and established companies focused on credit, payments, technology and ecommerce. Prior to Kabbage, Ms. Petralia was with Revolution Money, an internet-based credit card startup based in St. Petersburg, Florida, where she was vice president of strategy. Before Revolution, Ms. Petralia was a corporate development executive with CompuCredit Corporation, where she was responsible for entering new markets, initiating new product development and establishing multiple strategic alliances. Ms. Petralia was also one of the founders of worthknowing.com, a consumer financial services portal. She holds a B.A. in English literature from Furman University.

**Robert Sharpe, Chief Operating Officer**

Mr. Robert Sharpe is the Chief Operating Officer of Kabbage. He has more than 30 years of executive leadership experience in North America, Europe and Asia. Prior to joining Kabbage, Mr. Sharpe served as President, COO and CEO at various companies in the United States and globally. Mr. Sharpe has a bachelor of science degree in finance and accounting from the University of Michigan and an MBA from the George Washington University.

**Kevin Phillips, Head of Corporate Development**

Mr. Kevin Phillips is the head of corporate development at Kabbage. Mr. Phillips served as Chief Financial Officer of Kabbage through December 2015. Prior to his appointment as CFO, he was Kabbage's chief technology officer responsible for the development of Kabbage's technology platform. Mr. Phillips spent the previous seven years as chief operating officer of Scientific Intake, a Class 1 medical device company. Prior to Scientific Intake, Mr. Phillips served as chief information officer of several Atlanta based technology companies. After starting his career with Deloitte, he also had senior technology and operational roles in Europe and the United States. He has an undergraduate degree from Washington College in Chestertown, Maryland and an MBA from Georgia State University.

**Deepesh Jain, Head of Capital Markets**

Mr. Deepesh Jain is the head of capital markets at Kabbage where he is responsible for raising funding from banks and other institutional investors to help fund Kabbage's small business loans. Before joining Kabbage, Mr. Jain spent nearly 10 years at Capital One where he began in their debt capital markets group managing their credit card securitization programs. Later, he served as senior compliance manger, managing operational risk and regulatory compliance. Most recently, Mr. Jain was the head of U.S. capital markets execution at Barclays for six years. There, he oversaw treasury-related capital market activities in the U.S. Mr. Jain has an MBA from Cornell University.

**James Chou, Chief Technology Officer**

Mr. James Chou is the Chief Technology Officer at Kabbage. He has more than 20 years of experience leading technology companies. Prior to joining Kabbage, Mr. Chou served as CTO of WorkMarket, an ADP company; CTO of Shutterstock; Senior Vice President and CTO for American Greetings Interactive; and other executive roles at Apple, Inc., JP Morgan Chase & Co., and Accenture Plc. Mr. Chou has a bachelor of science degree in electrical and electronics engineering from University at Buffalo and an MBA from Duke University.

# Originations

## Kabbage

Kabbage targets marketing of the Kabbage Program towards small businesses with 1 to 50 employees, $50,000 to $10 million in annual revenue, and across all industry verticals. Kabbage's marketing department, which consists of approximately 20 employees, focuses on brand marketing to grow awareness, acquisition programs through direct channels to acquire customers, site and funnel optimization to increase conversion for applications, and customer loyalty marketing to drive utilization.

Kabbage sources customers through multiple acquisition channels, including: (1) search engine marketing and search engine optimization, (2) direct mail, (3) strategic referral partners, (4) Facebook and other display advertising, (5) radio and brand advertising, and (6) content marketing and press. Kabbage sources loans on behalf of Celtic Bank in all 50 states, U.S. territories and the District of Columbia.

All SMB Loans are originated in the name of Celtic Bank, and Kabbage arranges financing for the Kabbage Program by purchasing the receivables associated with such loans. Since inception, Kabbage has funded over $4.5 billion for over 135,000 customers. Through the Kabbage Platform, there have been originations of $1.5 billion, $1.2 billion, $877 million and $339 million in 2017, 2016, 2015, and 2014, respectively.

## Celtic Bank

Under the Kabbage Program, Celtic Bank underwrites, originates and funds the SMB Loans made to Merchants under the Kabbage Program. Kabbage serves as the program manager and provides marketing, origination, application processing, loan servicing and collection services for all SMB Loans originated by Celtic Bank. All program materials and changes, including any statements, disclosures or promotional materials are subject to review and approval by Celtic Bank. Kabbage has agreed to purchase all receivables associated with such SMB Loans, which receivables represent an undivided ownership interest in up to 100% of all amounts due or to become due by the Merchants under the related agreement. The transaction documents allow Kabbage to contract with another funding bank to originate receivables to be sold to the Issuer during the Revolving Period without noteholder consent, although rating agency confirmation would be required.

The agreement between Kabbage and Celtic Bank is scheduled to terminate in March 2019 but is subject to automatic renewal for successive one year terms unless either Kabbage or Celtic Bank provides notice of non-renewal to the other party at least 60 days prior to the end of the initial term or any subsequent renewal term. The agreement with Celtic Bank is not exclusive and does not prohibit Celtic Bank from working with competitors of Kabbage or prohibit Kabbage from potentially entering into bank relationships with other funding banks ("Credit Sponsors").



*Note –Originations in 2017 also included approximately $1.8 million of 18-month term loans

# Underwriting

Underwriting for qualified Merchants and, by extension, SMB Loans made under the Kabbage Program are governed by Celtic Bank's credit policy. As the program manager, Kabbage applies Celtic Bank's credit policy as part of the underwriting process. The underwriting process for SMB Loans is fully automated. Celtic Bank uses the Kabbage Platform and related technology, including Kabbage's proprietary risk scoring model, to apply its credit policy to generate automated credit decisions.

Kabbage maintains certain credit policy requirements for all loans. Any loan that meets these predetermined requirements receives a loan offer that is subject to completion of all verification processes prior to being funded.

| Group Credit Policy Requirements* | |
|---|---|
| Maximum Loan Term | 18 months |
| Maximum Loan Amount | $250,000 |
| Minimum Time in Business | 1 year |
| Minimum FICO score | 539 |
| Minimum Kabbage Score | 300 |
| Minimum Annual Revenue or | $12,000 |
| Minimum Average Bank Balance | $3,000 |

\* Loans in excess of 18 months, exceed $250,000, or a Kabbage Score of less than 560 will not be included in this transaction.

Underwriting decisions are made by a methodology that encompasses the following four categories:

- <u>Authentication</u>: Kabbage utilizes multiple information sources to verify the applicant and ownership of the business.
- <u>Exposure Capacity</u>: Each Merchant will be analyzed according to an appropriate model to determine cash flow available for financing.
- <u>Character</u>: Applicant's experience, motivation and character of the business (such as customer reviews/feedback) will be evaluated.
- <u>Consistency</u>: Cash flow efficiencies and revenue generation from the business's operation are analyzed.

Kabbage's proprietary risk scoring model assigns each applicant a score (the "Kabbage Score") ranging from 300 to 850. Applicants with lower Kabbage Scores have a higher probability of becoming a delinquent or defaulted receivable. Receivables with a Kabbage Score of less than 560 will not be eligible in this transaction.

Kabbage utilizes a proprietary risk model to assess the risk of prospects and applications. The Kabbage risk scoring model considers thousands of data elements from multiple sources including the credit bureaus, business sales performance, and information collected during the underwriting process to ensure that a full spectrum of knowledge on the borrower is acquired to assess risk. These borrower attributes relate to:

- Business Performance
- Business Characteristics
- Contract Risk
- Applicant's Consumer Credit Report
- Macroeconomic Factors
- Past Performance
- Online Footprint

**KBRA** KROLL BOND RATING AGENCY

# Financial Condition and Liquidity

Kabbage has incurred operating losses since its inception with the current strategy to continue to reinvest in growth opportunities. Total revenue in 2017 has been approximately $219 million compared to $171 million for 2016. Kabbage intends to expend significant funds to continue to grow its business, including to acquire customers and to fund ongoing operations. Kabbage has historically financed its operations through the issuance of debt and equity however, during the fourth quarter of 2017, Kabbage closed a $250 million equity investment from a subsidiary of SoftBank Group Corp. and an asset-backed, revolving credit facility with Credit Suisse for up to $200 million. These additional funding sources have allowed Kabbage to expand its lending products for small- and medium-sized businesses, to accelerate its software-as-a-service platform business and to explore other strategic opportunities for its small- and medium-sized businesses customers.

As of year-end 2017 Kabbage had $139.4 million dollars in cash, with approximately $14.4 million restricted. It is expected that the proceeds of the $60 million sale of the Series 2017-1 Additional Notes will be used to provide additional funding capacity for Kabbage.

# Servicing

Kabbage will act as Servicer for this transaction and First Associates Loan Servicing, LLC will act as backup servicer. In servicing the loans, Kabbage will be required to follow the same collection policies and procedures it will follow with respect to comparable SMB Loans that it owns or services for others.

The Servicer's servicing team uses the loan servicing platform to monitor and track payment activity. With built-in payment tracking functionality and automated missed payment notifications, the loan servicing platform allows the Servicer to monitor performance of outstanding loans on a real time basis.

Kabbage's customer service and collections teams are staffed by personnel located in the Kabbage's Atlanta office. Kabbage's collections representatives, which consist of about 18 personnel, are responsible for attempting to contact borrowers who have not made or are in danger of not making their minimum payments. Kabbage outsources some collections activity to external collections agencies for purposes of benchmarking internal collections performance as well as maintains relationships with such agencies in the event of disaster recovery situations or short-term capacity shortages.

The servicing policies and procedures currently used by Kabbage are:

- Loan Payments: The loan servicing platform automatically initiates an ACH or PayPal debit for scheduled payments on loans in accordance with the applicable payment schedule and tracks payment flow.

- Delinquency Management: A loan is characterized as delinquent if any scheduled loan payment has not been received in full by the next cycle date. A scheduled loan payment is missed when an ACH or PayPal debit attempt is not successful due to a lack of funds.

- Charge-Offs: An account is charged-off on or before the last day of the month in which the account becomes 180 days past due. In certain circumstances, an account may be manually charged-off prior to such date subject to internal approvals. For example, in the case of a bankruptcy of the customer, Kabbage will charge-off an account within 60 days of receipt of bankruptcy filing, if not sooner.

# Regulatory

SMB Loans are originated by Celtic Bank, a Utah state chartered industrial bank insured by the Federal Deposit Insurance Corporation (FDIC) and regulated by the Utah Department of Financial Institutions and the FDIC. As a service provider to Celtic Bank, Kabbage is subject to regulation and supervision of the FDIC under the Bank Service Company Act.

Although Merchants agree that they are entering into a commercial transaction and that the proceeds of the SMB Loans will be used solely for business purposes and will not be used for personal, family, or household purposes, if the SMB Loans deemed not to constitute business loans, Kabbage could become subject to the purview of the CFPB and other additional federal and state regulatory agencies.

Kabbage and the loans originated through the Kabbage Platform must comply with applicable federal, state and local regulation including (but not limited to):

- Fair Credit Reporting Act

- Equal Credit Opportunity Act

- Bank Secrecy Act

- Service Members Civil Relief Act

- Federal Trade Commission Act

- Telephone Consumer Protection Act

- Electronic Signatures in Global and National Commerce Act

Kabbage's internal policies and procedures have been reviewed by its internal legal and compliance staff with advice in certain instances from external regulatory compliance counsel. Kabbage has built its systems and processes with controls in place in order to permit its policies and procedures to be followed on a consistent basis.

Kabbage is rated A+ by the Better Business Bureau.

# Historical Performance

## Originations

Kabbage originates loans with Kabbage Scores ranging from 300 to 850. Receivables with a Kabbage Score of less than 560 will not be eligible in this transaction. Kabbage first originated 6-month loans in 2011 and 12-month loans in January 2015. As shown below, borrowers who receive a 12-month loan typically have higher Kabbage Scores than those who obtain a 6-month loan. In October 2017, Kabbage began originating 18-month loans, there is very limited data however all borrowers were in the 681-850 Kabbage Score range.

### 6-month Receivables

The table below displays originations for 6-month Receivables by year for 2011 through 2017.



### 12-month Receivables

The table below displays originations for 12-month Receivables by quarter for Q2 2015 through Q2 2017.



**KBRA** KROLL BOND RATING AGENCY

# Gross Charge-Offs

The tables below show historical information relating to cumulative gross charge-offs as a percentage of original receivable balance made through the Kabbage Platform since 2011 segmented by original term and Kabbage Score. Applicants with lower Kabbage Scores have a higher probability of becoming a delinquent or defaulted receivable. Although there were approximately $1.8 million of 18-month term originations in 2017, there have been no losses on these loans as of March 31, 2018.

## 6-month Receivables

The table below displays gross charge-offs for 6-month Receivables since 2011 by year and Q1 2017.



## 12-month Receivables

The table below displays gross charge-offs for 12-month Receivables since 2015 by quarter.



**KBRA** KROLL BOND
RATING AGENCY

# KBRA Loss Expectation

KBRA has analyzed Kabbage's historical static pool cumulative gross charge-off data since 2011, segmented by Kabbage Score and original term in order to develop a KBRA base case loss expectation per **KBRA's Global General Rating Methodology for Asset-Backed Securities**:

• Kabbage Score

• Original Term

To account for limited data, KBRA analyzed publicly available static pool loss data for comparable business loan and marketplace lending programs. This proxy data, in addition to Kabbage's management loss analysis, was used to help derive and validate the base case loss assumptions for each Kabbage Score range and original term.

Kabbage may sell charge-offs to third-parties in exchange for a small percentage of the remaining unpaid balance of Receivables. Kabbage may also outsource collections activity on charge-offs instead of selling charge-offs. Note that KBRA assumed no recoveries in its analysis of the transaction.

To account for the limited data, additional stresses were applied to the KBRA base case loss assumption and multiples were stressed for each KBRA stress scenario for the applicable note rating category.

Using this analysis and assuming the Receivables migrate to the "worst case" portfolio by Kabbage Score and original term mix allowed by the Excess Concentration Amounts and Eligibility Criteria, KBRA derived a weighted average base case loss rate of approximately 10.0%.

# Cash Flow Analysis

KBRA performed a cash flow analysis to test the transaction structure and assess whether the proposed enhancement levels are sufficient to warrant the requested ratings for each of the rated Notes. KBRA did not incorporate prepayments, recoveries on charged-off loans, and assumed Kabbage is no longer the Servicer in its cash flow analysis.

| Cash Flow Modeling Inputs ||
|---|---|
| **Item** | **Input** |
| Weighted Avg CGL | 10.0% |
| Recovery Rate | 0% |
| Prepayment Rate | 0% |
| Avg Receivables Yield | 38% |
| Loss Timing | Constant CDR |
| 6-month Loans | 50% of Pool |
| 12-month Loans | 40% of Pool |
| 18-month Loans | 10% of Pool |

Under these assumptions, the cash flow stresses resulted in the following coverage levels of the base case cumulative net loss assumption:

| Cash Flow Modeling Results |||||
|---|---|---|---|---|
| **Notes** | **Preliminary KBRA Rating** | **Breakeven CGL** | **Breakeven CNL** | **Breakeven CNL Multiple** |
| Class A | A (sf) | 38.2% | 38.2% | 3.82x |
| Class B | BBB (sf) | 25.6% | 25.6% | 2.56x |
| Class C | BB (sf) | 21.4% | 21.4% | 2.14x |
| Class D | B (sf) | 17.6% | 17.6% | 1.76x |

# Rating Sensitivity and Surveillance

KBRA's rating of the Notes represents a blended analysis of the key credit risk determinants. Events that may result in a rating change to the ABS transaction include, but are not limited to, the following:

- Changes to the Company's business strategy, management team, ownership structure or operations that cause KBRA to reassess its view of the Servicer;

- Deterioration in the transaction's asset performance that exceeds the Company's historical experience;

- Modifications of the transaction's structure or significant changes to the collateral; and

- A replacement of the Servicer.

After the initial rating is assigned, KBRA will continue to monitor the transaction until the Notes are fully repaid. Ongoing surveillance of the Notes is critical to maintaining the value of the rating. KBRA's surveillance process for securitization transactions involves a periodic review of the following:

- Servicing reports to determine if all payment obligations are met and the transaction is in compliance with all triggers and excess concentration amounts;

- Trends in collateral performance relative to historical experience; and

- The Company's financial performance and condition.

The information gathered during regular surveillance will indicate whether or not a more thorough review is warranted. Additional information may be requested if KBRA believes the credit quality of the transaction has changed from the time of the initial rating assignment or the most recent review. If warranted, KBRA will conduct an in-depth surveillance review that may result in a change to the transaction's rating and publish commentary explaining the analysis.


# Transaction Structure

**Legal Structure**

| | |
|---|---|
| Transaction Structure | The Notes are newly issued asset-backed securities collateralized by a revolving pool of receivables. The following diagram illustrates the basic securitization structure: |



(1) On the closing date, the Seller will transfer receivables arising under business loans or merchant cash advances to the Issuer for cash available from the sale of the Series 2017-1 Notes or as a contribution of capital to the Issuer. From time to time thereafter, the Seller may transfer additional receivables to the Issuer for cash available from payments on the receivables owned by the Issuer, the issuances of additional Series 2017-1 Notes or other series of notes or otherwise as contributions of capital to the Issuer.

(2) The Issuer pledges the receivables it acquires from the Seller and certain other assets to the Indenture Trustee to secure its notes, including the Series 2017-1 Notes.

(3) The Issuer issues the Series 2017-1 Notes and from time to time in the future may issue additional Series 2017-1 Notes and other series of notes.

(4) The Servicer services the receivables and remits payments on the receivables received from the merchants to the collection account. The Backup Servicer will provide certain services in respect of reports generated by the Servicer and other matters and, in the event that the Servicer is terminated after a Servicer Default, will agree at the request of the Indenture Trustee (acting at the direction of the Requisite Noteholders) to act as the successor servicer.

(5) The Issuer uses collections on the receivables allocated to the Series 2017-1 Notes to make payments on the Series 2017-1 Notes and during the revolving period to purchase additional receivables from the Seller, in each case pursuant to the payment priorities described in the offering document.

For further details, see the respective offering document.

**KBRA** | **KROLL BOND RATING AGENCY**

| | |
|---|---|
| Expandable Notes | The Notes will be "expandable" term notes such that at any time during the Revolving Period, the Issuer may periodically issue additional Series 2017-1 Notes, subject to the following conditions:<br><br>(a)  such issuance does not cause the maximum issuance amount of each class to exceed certain amounts as described in the transaction documents;<br><br>(b)  the rating agency condition is satisfied;<br><br>(c)  the Issuer and the Receivables to be acquired by the Issuer in connection with such issuance satisfy all conditions set forth in the transaction documents; and<br><br>(d)  at the time of such issuance a Rapid Amortization Event has not occurred and is not continuing.<br><br>Each additional issuance of Notes will have the same terms as the corresponding Class of Series 2017-1 Notes issued on the closing date, including the same Note Rate, Legal Final Payment Date and CUSIP. |
| Priority of Payments | The priority of payments will generally be as follows:<br><br>(1)  Fees, expenses and indemnities to service providers (up to a cap);<br><br>(2)  To the Servicer, any unreimbursed servicer advances;<br><br>(3)  If Kabbage is no longer the Servicer or if an Event of Default has occurred and is continuing, to the Servicer, the servicing fees;<br><br>(4)  To the Backup Servicer, backup servicing fees (up to a cap);<br><br>(5)  Interest on the Series 2017-1 Notes, paid sequentially;<br><br>(6)  During the Series 2017-1 Revolving Period, an amount equal to the Series 2017-1 Asset Deficiency Amount, if any, to the Series 2017-1 Excess Funding Account;<br><br>(7)  During the Series 2017-1 Revolving Period, the amount needed to replenish the Series 2017-1 Reserve Account, if any;<br><br>(8)  After the Series 2017-1 Revolving Period, principal on the Series 2017-1 Notes, paid sequentially;<br><br>(9)  Fees, expenses and indemnities to service providers (without a cap);<br><br>(10)  If Kabbage is the Servicer and no Event of Default has occurred and is continuing, to the Servicer, the servicing fees;<br><br>(11)  If Kabbage is no longer the Servicer, to the Servicer, the supplemental servicing fee;<br><br>(12)  All remaining funds to or at the direction of the Issuer. |
| Revolving Period | The transaction features a revolving period (the "Series 2017-1 Revolving Period"), which will end on the earlier of (i) the payment date occurring in the month that is 36 months after the initial closing date and (ii) the date on which a Rapid Amortization Event has occurred.<br><br>There will only be one Revolving Period, and such period cannot be re-commenced or continue after it has terminated. |

**KBRA** **KROLL BOND RATING AGENCY**

| | |
|---|---|
| Rapid Amortization Events | The following events will be automatic "Rapid Amortization Events" with respect to the Series 2017-1 Notes: |
| | • the occurrence of any of the following events (each a "Trigger Event") as of any payment date: |
| | ○ the three-month weighted average receivables yield on such payment date is less than 38.00%, |
| | ○ the three-month weighted average excess spread on such payment date is less than 8.00%; or |
| | ○ the three-month average delinquency ratio on such payment date is greater than 15.00%; |
| | • an asset deficiency exists for three or more business days; |
| | • a Servicer Default occurs; |
| | • an Event of Default with respect to the Series 2017-1 Notes occurs under the transaction documents; or |
| | • either the Seller or the Servicer suffers certain specified bankruptcy or insolvency events. |
| Events of Default | The occurrence of any of the following events will constitute an "Event of Default" under the indenture: |
| | (a) failure to pay interest when due for five business days; |
| | (b) failure to pay principal when due; |
| | (c) failure by the Issuer to observe or perform any covenant or agreement in the transaction documents and that failure has a materially and adverse effect on holders of the Notes and continues or is not cured for 30 days; |
| | (d) the receipt by the Issuer of a final determination that it will be treated as an association taxable as a corporation for federal income tax purposes; |
| | (e) the Issuer is an "investment company" within the meaning of the Investment Company Act; |
| | (f) certain bankruptcy or insolvency events occur with respect to the Issuer; |
| | (g) the Indenture Trustee fails to have a valid and perfected first priority security interest in the collateral and such failure continues for five business days; |
| | (h) the occurrence of a Receivables File Discrepancy Event; or |
| | (i) any of the transaction documents ceases for any reason to be in full force and effect other than in accordance with its terms. |

**KBRA** KROLL BOND RATING AGENCY

| Excess Concentration | The Receivables are subject to certain concentration limits that, when exceeded, will be excluded from the Series 2017-1 Adjusted Pool Balance which will require the Issuer to maintain additional credit enhancement for the Notes. The Current Pool % shown below is taken from the April 2018 Monthly Settlement Statement. Such concentration limits are based on the amounts, without duplication, in excess of the following limits, determined as a percentage of the aggregate outstanding receivables balance of Eligible Receivables (collectively, the "Series 2017-1 Excess Concentration Amounts"): |

| Kabbage 2017-1 Excess Concentration Amounts | | |
|---|---|---|
| Concentration Amount | Kabbage 2017-1 Limit % | Current Pool % as of March 31, 2018 |
| Merchants located in California | 20.00% | 16.28% |
| Merchants located in Florida | 15.00% | 9.67% |
| Merchants located in Texas | 15.00% | 8.02% |
| Merchants located in New York | 15.00% | 7.72% |
| Merchants located in any other single state | 10.00% | 3.96% |
| Merchants with Outstanding Receivables Balances greater than $75,000 | 40.00% | 13.04% |
| Merchants with Outstanding Receivables Balances greater than $125,000 | 20.00% | 2.15% |
| Merchants in business for less than 1 year | 0.00% | 0.00% |
| Merchants in business for less than 2 years | 10.00% | 3.70% |
| Merchants in business for less than 3 years | 40.00% | 10.59% |
| Merchants in business for less than 4 years | 60.00% | 20.58% |
| Receivables with a remaining term of 7 to 18 months | 50.00% | 38.30% |
| Receivables with (a) a remaining term of 13 to 18 months and/or (b) an Outstanding Receivables Balance between $150,000.01 and $250,000.00; provided, however, that each such Receivable has a minimum Kabbage Score of 700 | 10.00% | 0.51% |
| Receivables that are 30 to 59 days past due | 8.00% | 2.20% |
| Receivables that are 60 or more days past due | 0.00% | 7.33% |
| Receivables with a Kabbage Score less than 600 | 5.00% | 0.75% |
| Receivables that are subject to Material Modifications | 5.00% | 4.98% |
| Receivables that relate to Renewal Loans | 15.00% | 0.00% |
| Merchant businesses in highest concentration industry* | 25.00% | 14.50% |
| Merchant businesses in highest 2 concentration industries* | 30.00% | 17.53% |
| Merchant businesses in highest 5 concentration industries* | 45.00% | 25.52% |
| Merchant businesses in highest 10 concentration industries* | 70.00% | 34.87% |
| Merchants that have not agreed to make payments through ACH or PayPal (or other electronic payment service) | 5.00% | 3.93% |

* Industries are classified by NAICS industry code. For purposes of this test, Receivables relating to Merchants in unclassified industries will be counted as part of a single industry.

| Reserve Account | The "Series 2017-1 Reserve Account" was funded with $2,910,053 with the previously issues Series 2017-1 Notes and will be funded on the additional notes closing date with $317,461 to maintain an amount equal to approximately 0.50% of the aggregate principal balance of the Notes divided by 94.50%. The Series 2017-1 Reserve Account will be available to pay transaction expenses and interest on the Notes. |


| Eligibility Criteria | Criteria for an "Eligible Receivable" will include, among other things, that each such receivable: |
|---|---|
| | • arises in the ordinary course of the Seller's or the Credit Sponsor's business and was originated in accordance with, and conforms to, the credit policies; |
| | • was originated by the Seller or the Credit Sponsor in compliance with all applicable laws and regulations and remains in compliance with all applicable laws and regulations; |
| | • is due from an Eligible Merchant; |
| | • is not (i) 60-days past due or (ii) if the acquisition of such Receivable by the Issuer would result in any excess concentration limitation applicable to 30-days past due receivables to be exceeded, 30-days past due; |
| | • is denominated in U.S. dollars; |
| | • if such Receivable has an original principal amount that exceeds $250,000, then only $250,000 will be eligible; |
| | • is a monthly (or more frequent pay) receivable; |
| | • has an original term less than or equal to 18 months; |
| | • does not have a maturity date later than six months prior to the earliest legal final maturity date of any series of Notes outstanding; |
| | • has a receivable yield greater than or equal to 19.00% per annum; |
| | • together with all other Eligible Receivables, has a weighted average receivables yield of at least 38.00% per annum; |
| | • together with all other Eligible Receivables, has a weighted average remaining term of no more than 13 months; |
| | • has received Kabbage Score of no less than 560; |
| | • has received a FICO score of no less than 539; |
| | • relates to Merchants with a weighted average Kabbage Score of 675 or greater as of the date of its underwriting; and |
| | • if has an 18-month original term, then such Receivable has (i) a Kabbage Score of at least 700, (ii) the related Merchant has been in business for at least 3 years and (iii) the related Merchant has annual gross revenue of at least $150,000 per annum. |
| Eligible Merchant | Criteria for an "Eligible Merchant" will include, among other things, that each such receivable: |
| | • is domiciled in the United States; |
| | • is not subject to any proceedings under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect and |
| | • is a business that has been operating for at least one year. |

| Servicer Defaults | The occurrence of any of the following events will constitute a "Servicer Default" under the servicing agreement: |
|---|---|
| | (a)   the Servicer fails to make any payment, transfer or deposit to the Indenture Trustee on the date that payment, transfer or deposit was due and such failure shall continue for five business days; |
| | (b)   any representation or warranty made by the Servicer in the servicing agreement or in any statement or certificate at any time given by the Servicer in writing pursuant to the transaction documents is incorrect when made and such inaccuracy has a material and adverse effect on the interests of the holders of the Notes and such inaccuracy is not cured for a period of 30 consecutive days; |
| | (c)   any failure by the Servicer to comply with any of its agreements or covenants contained in the transaction documents and such failure has a material and adverse effect on the interests of the holders of the Notes and such failure is not cured for a period of 30 consecutive days; |
| | (d)   certain bankruptcy or insolvency events shall have occurred with respect to the Servicer; |
| | (e)   the three-month average excess spread on such payment date is less than 8.00%; or |
| | (f)   the three month average delinquency ratio on such payment date is greater than 15.00%. |
| Representations and Warranties | For more detailed information regarding the representations, warranties and enforcement mechanisms available under the transaction documents, please see KBRA's Kabbage Asset Securitization LLC, Series 2017-1 Representations and Warranties Disclosure available **here**. |

**KBRA** **KROLL BOND RATING AGENCY**

© Copyright 2018, Kroll Bond Rating Agency, Inc., and/or its licensors and affiliates (together, "KBRA"). All rights reserved. All information contained herein is proprietary to KBRA and is protected by copyright and other intellectual property law, and none of such information may be copied or otherwise reproduced, further transmitted, redistributed, repackaged or resold, in whole or in part, by any person, without KBRA's prior express written consent. Ratings are licensed by KBRA under these conditions. Misappropriation or misuse of KBRA ratings may cause serious damage to KBRA for which money damages may not constitute a sufficient remedy; KBRA shall have the right to obtain an injunction or other equitable relief in addition to any other remedies. The statements contained in this report are based solely upon the opinions of KBRA and the data and information available to the authors at the time of publication of this report. All information contained herein is obtained by KBRA from sources believed by it to be accurate and reliable; however, KBRA ratings are provided "AS IS". No warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability, or fitness for any particular purpose of any rating or other opinion or information is given or made by KBRA. Under no circumstances shall KBRA have any liability resulting from the use of any such information, including without limitation, for any indirect, special, consequential, incidental or compensatory damages whatsoever (including without limitation, loss of profits, revenue or goodwill), even if KBRA is advised of the possibility of such damages. The credit ratings, if any, and analysis constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. KBRA receives compensation for its rating activities from issuers, insurers, guarantors and/or underwriters of debt securities for assigning ratings and from subscribers to its website.

**KBRA** KROLL BOND RATING AGENCY

**U.S. Structured Finance**

ABS New Issue Report

# Kabbage Asset Securitization LLC, Series 2017-1

### $525.0 Million Asset Backed Securities



**Analytical Contacts:**

Alan Greenblatt, Director
agreenblatt@kbra.com, (646) 731-2496

Lenny Giltman, Managing Director
lgiltman@kbra.com, (646) 731-2378

Anthony Nocera, Senior Managing Director
anocera@kbra.com, (646) 731-2350

March 20, 2017

**KBRA** KROLL BOND RATING AGENCY

## Table of Contents

Executive Summary ..................................................................................................................3

   Transaction Overview ........................................................................................................3

   Key Credit Considerations ..................................................................................................4

KBRA Process .........................................................................................................................9

Transaction Summary ............................................................................................................10

Seller and Servicer ...............................................................................................................11

   Company Overview ..........................................................................................................11

   Management ....................................................................................................................12

   Originations .....................................................................................................................13

   Underwriting....................................................................................................................14

   Financial Condition and Liquidity ......................................................................................15

   Servicing.........................................................................................................................15

   Regulatory ......................................................................................................................16

Historical Performance ...........................................................................................................17

   Originations .....................................................................................................................17

   Gross Charge-Offs ...........................................................................................................18

KBRA Loss Expectation ..........................................................................................................19

Cash Flow Analysis ................................................................................................................19

Rating Sensitivity and Surveillance ..........................................................................................20

Transaction Structure ............................................................................................................21

**KBRA** **KROLL BOND RATING AGENCY**

# Executive Summary

This transaction report is based on information regarding the underlying collateral pool and the terms of the securitization as of March 20, 2017. The ratings listed below are final. This report does not constitute a recommendation to buy, hold, or sell securities. Kroll Bond Rating Agency's (KBRA) ratings represent the timely payment of interest and ultimate payment of principal of each class of notes by the applicable legal final payment date.

| Rated Notes | | | | | | |
|---|---|---|---|---|---|---|
| Notes | Initial Principal Balance | Note Rate | Advance Rate | Initial Credit Enhancement* | Legal Final Payment Date | KBRA Rating |
| Class A | $388,889,000 | 4.571% | 70.00% | 30.50% | March 2022 | A (sf) |
| Class B | $83,333,000 | 5.794% | 85.00% | 15.50% | March 2022 | BBB (sf) |
| Class C | $27,778,000 | 8.000% | 90.00% | 10.50% | March 2022 | BB (sf) |
| Class D | $25,000,000 | 10.000% | 94.50% | 6.00% | March 2022 | B (sf) |
| Total: | $525,000,000 | | | | | |

\* Initial credit enhancement shown above includes overcollateralization, subordination and the Series 2017-1 Reserve Account.

## Transaction Overview

Kabbage Asset Securitization LLC (the "Issuer") issued the Series 2017-1 Class A, Class B, Class C, and Class D Notes (collectively, the "Notes" or "Series 2017-1 Notes"). This transaction ("Kabbage 2017-1") is Kabbage, Inc.'s ("Kabbage", the "Seller", the "Servicer" or the "Company") second securitization and it is expected that the proceeds of the sale of the Series 2017-1 Notes will be used to refinance the Company's existing securitization ("Kabbage 2014-1").

Founded in 2009, Kabbage is a financial technology company that uses its proprietary risk scoring models, transactional data, technology systems and platform to provide fully automated, online access to business loans (the "SMB Loans") for small- and medium-sized businesses ("Merchants"). Kabbage has also provided working capital to Merchants by purchasing a specified amount of a Merchant's future receivables known as merchant cash advances ("MCAs"). Approximately 0.01% of the Receivables in the Statistical Pool consist of MCAs. The Kabbage business loan program (the "Kabbage Program") is offered via Kabbage's automated loan application, underwriting and servicing platform (the "Kabbage Platform").

The Kabbage Platform currently allows Merchants to access uncommitted business lines of credit up to $150,000 for a 6- or 12- month installment loan issued by Celtic Bank, a Utah chartered industrial bank, member FDIC ("Celtic Bank"). A business approved under the Kabbage Program can draw on the line up to the credit limit as needed, however Kabbage can cut off the borrower's ability to draw on the business line for a variety of reasons including missed payments. Kabbage is expecting to launch loan products with 18-, 24- and 36-month terms in exposure limits up to $400,000 in the future, although loans in excess of 18 months or $250,000 will not be included in this transaction. The average original receivables balance per Receivable and weighted average original term in the Statistical Pool is $7,486.20 and 9.0 months, respectively.

The SMB Loan or MCA borrowed by the Merchant is repaid in equal principal payments over the original term of the loan with interest charges based on the initial borrowed amount. Each loan will have a "big fee" (typically 2% to 11%) for the first 2 months for 6-month loans and the first 6 months for 12-month loans, as well as a 1% "small fee", for the remaining term of the loan. For the 18-month loans the "big fee" will be for the first 10 months.

**KBRA** KROLL BOND RATING AGENCY

The Notes are secured by a revolving pool of receivables (the "Receivables" or the "Portfolio") consisting of (i) SMB Loans or (ii) MCAs. The transaction features a revolving period (the "Revolving Period"), which will end on the earlier of (i) the payment date occurring in the month that is 36 months after the closing date and (ii) the date on which a Rapid Amortization Event has occurred.

The Notes are "expandable" term notes such that at any time during the Revolving Period, the Issuer may periodically issue additional Notes, so long as certain conditions are met, including receipt of rating agency confirmation. The consent of existing noteholders will not be required for these additional issuances, and investors should note that any additional note issuance would dilute the control and vote of existing noteholders.

As of December 31, 2016, the statistical pool of receivables (the "Statistical Pool") had an aggregate outstanding receivables balance of $442,434,677.71 (the "Statistical Balance"). The Statistical Pool is expected to be representative of the actual Receivables that will be transferred by the Seller to the Issuer on the closing date. The Receivables that are ultimately transferred by the Seller to the Issuer on the closing date are expected to have an aggregate outstanding receivables balance of approximately $555,555,800 (the "Target Closing Receivables Balance").

| Transaction Parties | |
|---|---|
| Issuer | Kabbage Asset Securitization LLC |
| Seller and Servicer | Kabbage, Inc. |
| Platform | **www.kabbage.com** |
| Initial Backup Servicer | First Associates Loan Servicing, LLC |
| Indenture Trustee and Custodian | U.S. Bank National Association |
| Originator / Credit Sponsor / Funding Bank | Celtic Bank, a Utah chartered industrial bank |
| Administrator | CBIZ MHM LLC |
| Sole Structuring Advisor, Book-Running Manager and Initial Purchaser | Guggenheim Securities, LLC |

# Key Credit Considerations

### Strength of the Seller and Servicer

Founded in 2009, Kabbage is a financial technology company that uses financial services data and technology platform to provide business loans to Merchants. Since inception, Kabbage has funded over $2.7 billion for over 90,000 customers. The Company has over 330 employees with offices in Atlanta, San Francisco, New York, Ireland and India. Members of the senior management team have over 20 years of experience in payment processing, financial services and/or small business marketplace lending.

Kabbage previously sponsored a securitization in September 2014 which is currently rated by KBRA and has performed in line with expectations. It is expected that the proceeds of the sale of the Series 2017-1 Notes will be used to refinance Kabbage 2014-1. KBRA believes Kabbage has an experienced management team and the operational capabilities to service the Portfolio.



**KBRA** KROLL BOND RATING AGENCY

## Key Credit Considerations

**Transaction Structure**

KBRA believes the transaction has sufficient credit enhancement, along with a structure that accelerates principal payments on the Notes upon a deterioration of asset performance to support the rating on the Notes. Key credit enhancements will consist of:

- Excess Cash Flow:

  - The weighted average receivables yield of the Statistical Pool is approximately 41.11%, which should result in significant excess spread over the coupons of the Notes and monthly fees and expenses. Regarding additional receivables to be purchased by the Issuer during the Revolving Period, the transaction documents require that the weighted average receivables yield for the entire pool to be at least 38.00% per annum and the receivables yield on any individual receivable to be at least 19.00% per annum.

  - Monthly distributions of principal pursuant to the priority of payments will include a yield supplement amount.

- Overcollateralization:

  - Class A Notes: Maximum advance rate: 70.00% (30.00% overcollateralization)

  - Class B Notes: Maximum advance rate: 85.00% (15.00% overcollateralization)

  - Class C Notes: Maximum advance rate: 90.00% (10.00% overcollateralization)

  - Class D Notes: Maximum advance rate: 94.50% (5.50% overcollateralization)

  - Reserve Account: Funded on the closing date with $2,777,778, and maintain an amount equal to approximately 0.50% of the aggregate outstanding principal balance of the Notes divided by 94.50% (the "Series 2017-1 Required Reserve Account Amount").

- Subordination: Each junior class of Notes will be subordinated in right of payment to each class of Notes that is senior.

- Trigger Events: Occurrence of any of the following events will cause principal payments on the Notes to be accelerated (with payments occurring sequentially):

  - the three-month weighted average receivables yield on such payment date is less than 38.00%;

  - the three-month weighted average excess spread on such payment date is less than 8.00%; or

  - the three-month average delinquency ratio on such payment date is greater than 15.00%.

- Servicing Fee: If Kabbage is the Servicer, the servicing fee is payable after interest and principal on the Notes, however KBRA assumed Kabbage is no longer the Servicer in its cash flow analysis.

Additional information is included in the **Transaction Structure** section.



**KBRA** KROLL BOND RATING AGENCY

## Key Credit Considerations

### Revolving Period and Prefunding Feature

The transaction features a 36-month period (the "Revolving Period"), during which time no payments of principal of the Notes will be made unless the Issuer elects to prepay the Notes in full on or after the payment date in March 2019. Cash flow from principal collections may be reinvested to purchase additional receivables, based on certain eligibility requirements. The existence of the Revolving Period adds uncertainty to the Portfolio composition and could allow the Portfolio to become more concentrated and vary somewhat from the closing date.

On the closing date, the transaction may only contain (but not less than) 85% of the Targeted Closing Receivables Balance. If 100% of the Target Closing Receivables Balance isn't transferred on the closing date, an amount (the "Prefunded Amount"), if any, will be deposited into the Series 2017-1 Excess Funding Account, which amounts will be available for the purchase of additional Receivables. The remaining Receivables are expected to be transferred to the Issuer during the next three to six weeks after closing. A capitalized interest account will be funded at closing available for certain expenses and interest on the Notes for the first three payment dates.

All additional receivables must satisfy the eligibility criteria described further in the offering document and within the **Transaction Structure** section. KBRA has assumed that the cash flow will be reinvested to the "worst case" Portfolio permitted within the transaction's eligibility requirements.

**–**

### Portfolio Remaining Term

The Statistical Pool has an initial weighted average remaining term of approximately 7.7 months. There are restrictions when adding additional receivables that such receivable, together with all other Eligible Receivables, has a weighted average remaining term of no more than 13 months. In addition, Excess Concentration Amounts limit 50% of the Portfolio to have a remaining term greater than 6 months or more and further limit 10% of the Portfolio to have a remaining term greater than 12 months or more. The shorter remaining term allows for less time for an obligor default to occur. KBRA recognizes the tenor of the loans could create potential stress or affordability issues for the obligors due to the high rates and short term nature of the loans. KBRA has addressed this concern in its analysis of the historical performance of the loans and the cash flow analysis within.

**+/-**

### Limited Performance Data for Longer Loan Terms

Kabbage has limited operating history on its 12-month and 18-month loans that may be included in the Portfolio. Kabbage first originated 6-month loans in 2011 and 12-month loans in January 2015, with 18-month loans part of a new product launch expected to occur in 2017.

Loans with remaining terms of 12 months can be up to 50% of the Portfolio, with a sublimit of loans with remaining terms of 18 months up to 10% of the Portfolio. To account for the limited data, additional stresses were applied to the KBRA base case assumption and loss multiples were stressed for each note rating category.

**–**

**KBRA** KROLL BOND RATING AGENCY

# Key Credit Considerations

## Internet Lending

Internet-based lending is inherently riskier than in-person lending as there is a greater potential for falsification of information and borrower fraud. Applicants may also misrepresent their intentions regarding loan purpose or treat their obligations on the loans originated through the internet as having less significance and a lower payment priority to those loans originated through traditional lending sources where they may have other business relationships. Therefore, an online lender needs to possess adequate internal controls and robust fraud detection procedures.

Kabbage uses identity and fraud checks analyzing data provided by external databases to authenticate each borrower's identity. Any loans that were originated to customers with verifiable identity theft or fraud must be repurchased by Kabbage. KBRA believes Kabbage possesses adequate resources and procedures for information verification and fraud detection.

**+/-**

## Regulatory Environment for Online Lenders

The online lending industry was a high-growth, high-profile sector that has attracted the attention of various regulators and the regulatory oversight of securities and capital markets. Although there have not been any statutory or regulatory requirements imposed specifically on online lenders to date, in 2015, the U.S. Treasury Department issued a request for information on online lending. The Treasury Department received a large number of responses from a variety of stakeholders. In May 2016, the US Treasury Department released its response in a white paper titled "Opportunities and Challenges in Online Marketplace Lending". In response to the white paper, Kabbage has incorporated into their merchant agreements a comparison tool called the SMART (Straightforward Metrics Around Rate and Total Cost) Box. The SMART Box is focused on empowering small businesses to better assess and compare finance options as well as advance small business online lending education and transparency. There will likely be greater regulation to address the recommendations in the report.

Furthermore, in December 2015, the California Department of Business Oversight launched an inquiry into 14 online lenders, including Kabbage. In May 2016, the New York Department of Financial Services requested information from 28 online lending companies. There is a possibility that Kabbage's business may become subject to additional or different regulations in the future.

Although Merchants agree that they are entering into a commercial transaction and that the proceeds of the SMB Loans will be used solely for business purposes and will not be used for personal, family, or household purposes, if the SMB Loans are deemed not to constitute business loans, Kabbage could become subject to the purview of the CFPB and other additional federal and state regulatory agencies. Such additional regulatory scrutiny and potential additional regulation could impose specific statutory liability on creditors who fail to comply with the provisions of applicable laws and regulations.

KBRA anticipates this regulatory scrutiny will continue over the next few years but believes that Kabbage is proactively seeking to address any regulatory concerns and promote transparency in its lending platform operations.

**+/-**

**KBRA** KROLL BOND RATING AGENCY

## Key Credit Considerations

### Challenges to Exportation of State Usury Laws and True Lender Issues

Loans from the Kabbage Platform are currently originated by Celtic Bank, a Utah chartered industrial bank. Federal law generally permits the exportation of usury laws in effect in the state in which the bank is organized to a borrower's state. Recently, however, some courts have ruled that Federal preemption of state interest caps would not apply in some circumstances. In May 2015, for instance, the Second Circuit ruled in *Madden v. Midland Funding* that a non-bank purchaser of charged-off credit card loans cannot rely on state law preemption to charge interest rates that exceeded the usury limit in New York. Although the *Madden* ruling only applies to New York, Connecticut and Vermont, and it only addressed a consumer credit product, it is possible similar decisions could be adopted by courts in other jurisdictions or that other courts or regulators could choose to review small business loans in the context of usury or true lender issues in a manner akin to the scrutiny given consumer credit products.

Kabbage believes the legal structure underlying Kabbage's relationship with Celtic Bank is distinguishable from the structure in the *Madden* case. Furthermore, Kabbage believes it is unlikely that courts or regulators would apply the same level of scrutiny afforded to consumer credit products as it would to Kabbage's credit products considering Kabbage's underwriting processes. To date, no actions have been taken or threatened against Kabbage on the theory that it has engaged in unauthorized lending or loan brokering through its relationship with Celtic Bank.

### Relationship with Celtic Bank

Celtic Bank is currently the primary issuing bank for all receivables originated through the Kabbage Platform. Kabbage has agreed to purchase all receivables associated with such SMB Loans, which receivables represent an undivided ownership interest in up to 100% of all amounts due or to become due by the Merchants under the related agreement. The transaction documents allow Kabbage to contract with another funding bank ("Credit Sponsor") to originate receivables to be sold to the Issuer during the Revolving Period without noteholder consent, although rating agency confirmation would be required.

The agreement between Kabbage and Celtic Bank is scheduled to terminate in March 2019 but is subject to automatic renewal for successive one year terms. The agreement with Celtic Bank is not exclusive and does not prohibit Celtic Bank from working with competitors of Kabbage or prohibit Kabbage from potentially entering into bank relationships with other Credit Sponsors.

**KBRA** KROLL BOND RATING AGENCY

## Key Credit Considerations

**Third Party Due Diligence Review**

CBIZ MHM LLC ("CBIZ" or the "Administrator") will be engaged to provide certain reporting services both monthly and annually, which will include, among other items:

*Monthly Services*:

- Recalculate certain data fields,
- Calculate the total interest due for the Notes;
- Calculate the Receivables pool balance;
- Calculate the ineligibles total amounts and the over concentration total amounts;
- Calculate the 94.50% of the Receivables adjusted pool balance;
- Calculate the asset deficiency amount; and
- Review a sample of 100 Receivables and compare, confirm or calculate, as applicable, 15 data fields (the "Receivables File Review").

In connection with each Receivables File Review, if the sample error rate of any of the data fields exceeds 4%, then the Administrator will notify the respective service providers of the data integrity discrepancy (a "Receivables File Discrepancy Event") and 200 Receivables will be sampled by the Administrator the following month. If based on the results of the 200 Receivables tested in the following month results in a data field exceeding 4%, a Receivables File Discrepancy Event and an Event of Default will occur under the Indenture.

*Annual Services*:

- Management discussion and overview,
- Underwriting/credit approval summary,
- Servicing and collections summary and
- Internal, external and regulatory audit and systems review.

# KBRA Process

KBRA analyzed the transaction using the **General Rating Methodology for Asset-Backed Securities** published on July 30, 2012. The transaction falls within Category 1 – Financial Assets, which typically relates to transactions that are backed by pools of consumer or commercial financial obligations owed by diverse obligors with payment terms that fully pay interest and principal on the Asset-Backed Securities.

KBRA's general methodology incorporates an analysis of: (1) the underlying collateral pool, (2) the platform's historical static pool data, segmented by characteristics including credit quality and product type, (3) the proposed capital structure for the transaction, (4) KBRA's operational assessment of the platform and servicer, and (5) the legal structure, transaction documents, and legal opinions.

KBRA has performed an on-site operational review of the Company in June 2016 at their Atlanta, GA headquarters and has met with the Company for updates. In addition, KBRA conducted phone interviews with a representative from Celtic Bank to discuss its underwriting process and arrangement with Kabbage.

**KBRA** KROLL BOND RATING AGENCY

# Transaction Summary

The table below summarizes the characteristics of the Statistical Pool as of December 31, 2016.

| Kabbage Asset Securitization LLC, Series 2017-1 | |
|---|---|
| **Collateral Stratification** | |
| Number of Receivables | 97,529 |
| Number of Merchants | 29,311 |
| Average Number of Receivables per Merchant | 3.3 |
| Pool Outstanding Receivables Balance | $442,434,678 |
| Average Outstanding Receivables Balance per Receivable | $4,536 |
| Maximum Outstanding Receivables Balance per Receivable | $100,000 |
| Average Outstanding Receivables Balance per Merchant | $15,094 |
| Maximum Outstanding Receivables Balance per Merchant | $150,035 |
| Aggregate Original Receivables Balance | $730,121,187 |
| Average Original Receivables Balance per Receivable | $7,486 |
| Average Original Receivables Balance per Merchant | $24,909 |
| Weighted Average Receivable Yield at Origination | 41.11% |
| Weighted Average Original Term (months) | 9.0 |
| Weighted Average Remaining Term (months) | 7.7 |
| Weighted Average Age (months) | 2.2 |
| Weighted Average FICO Score | 692 |
| Weighted Average Kabbage Score | 698 |
| Weighted Average Time in Business (years) | 9.2 |
| Weighted Average Annualized Gross Revenue | $916,182 |
| **Range of Remaining Term to Maturity Distribution** | |
| 1 to 6 months | 59.03% |
| 7 to 12 months | 37.19% |
| 13 or more months | 3.79% |
| **Original Term to Maturity Distribution** | |
| 6 months | 49.33% |
| 12 months | 50.67% |
| **Range of Kabbage Score Distribution** | |
| 560 to 599 | 1.22% |
| 600 to 649 | 8.62% |
| 650 to 699 | 36.62% |
| 700 to 749 | 53.01% |
| 750 to 799 | 0.51% |
| 800 to 850 | 0.02% |
| **Geographic Concentration** | |
| Largest State | California:  15.80% |
| Second Largest State | Florida:  10.43% |
| Third Largest State | Texas:  7.94% |

In addition, the Receivables must satisfy the Eligibility Criteria further described in the offering document and within the Transaction Structure section.

**KBRA** KROLL BOND RATING AGENCY

The table below summarizes the credit enhancement structure of this transaction.

| Kabbage Asset Securitization LLC, Series 2017-1 | |
|---|---|
| **Transaction Structure** | |
| Class A Balance | $388,889,000 |
| Class B Balance | $83,333,000 |
| Class C Balance | $27,778,000 |
| Class D Balance | $25,000,000 |
| Total Balance | $525,000,000 |
| Class A Advance Rate / Initial CE* | 70.00% / 30.50% |
| Class B Advance Rate / Initial CE* | 85.00% / 15.50% |
| Class C Advance Rate / Initial CE* | 90.00% / 10.50% |
| Class D Advance Rate / Initial CE* | 94.50% / 6.00% |
| Reinvestment Period | 36 months |
| Reserve Account | 0.50% |
| **KBRA Ratings** | |
| Class A | A (sf) |
| Class B | BBB (sf) |
| Class C | BB (sf) |
| Class D | B (sf) |
| **KBRA Base Case Loss Expectation** | |
| KBRA Base Case Loss Range | 9.00% - 11.00% |

\*    Initial credit enhancement (CE) shown above includes overcollateralization, subordination and the Series 2017-1 Reserve Account.

# Seller and Servicer

## Company Overview

Founded in 2009, Kabbage is a financial technology company that uses its proprietary risk scoring models, transactional data, technology systems and platform to provide fully automated, online access to business loans (the "SMB Loans") for small- and medium-sized businesses ("Merchants"). Kabbage has also provided working capital to Merchants by purchasing a specified amount of a Merchant's future receivables known as merchant cash advances ("MCAs"). The Kabbage business loan program (the "Kabbage Program") is offered via Kabbage's automated loan application, underwriting and servicing platform (the "Kabbage Platform").

The Kabbage Platform allows Merchants to access uncommitted business lines of credit up to $150,000 for a 6- or 12- month installment loan issued by Celtic Bank, a Utah chartered industrial bank, member FDIC ("Celtic Bank"). Initially, the Kabbage Program offered a 6-month term product and in January 2015, the Kabbage Program began offering a 12-month term product. Kabbage is expecting to launch loan products with 18-, 24- and 36- month terms in exposure limits up to $400,000 in the future, although loans in excess of 18 months or $250,000 will not be included in this transaction. Kabbage also licenses its Kabbage Platform to financial institutions and other organizations across the globe.

Under the Kabbage Program, Celtic Bank underwrites, originates and funds the SMB Loans while Kabbage serves as the program manager providing marketing, origination, application processing, loan servicing and collection services for all loans. Under an agreement with Celtic Bank, Kabbage purchases the right to all of the loan payments and other receivables associated with such SMB Loans. Celtic Bank retains title to the underlying SMB Loans through maturity, but has agreed to transfer title under certain circumstances.

Since inception, Kabbage has funded over $2.7 billion for over 90,000 customers through the Kabbage Platform. The Company has over 330 employees with offices in Atlanta, San Francisco, New York, Ireland and India.

**KBRA** KROLL BOND RATING AGENCY

# Management

During 2016, KBRA met with Kabbage's management team, including those responsible for credit, business development, finance and operations. Members of the senior management team have over 20 years of experience in the payment processing, financial services and/or small business marketplace.

### Rob Frohwein, Chief Executive Officer

Frohwein is the chief executive officer and co-founder of Kabbage. Prior to Kabbage, Frohwein was CEO of LAVA Group, Inc., an intellectual property and technology investment bank. Prior to LAVA Group, Frohwein held the positions of senior vice president, business development and general counsel of ZapMedia, vice president of strategic alliances and general counsel of Security First Network Bank, and an attorney with Troutman Sanders LLP, an international law firm. Frohwein is a graduate of Villanova Law School and studied economics at Dickinson College in Carlisle, PA.

### Kathryn Petralia, Chief Operating Officer

Petralia is the chief operating officer and co-founder of Kabbage. She has spent the past 20 years working with both startups and established companies focused on credit, payments, technology and ecommerce. Prior to Kabbage, Petralia was with Revolution Money, an internet-based credit card startup based in St. Petersburg, Florida, where she was vice president of strategy. Before Revolution, Petralia was a corporate development executive with CompuCredit Corporation, where she was responsible for entering new markets, initiating new product development and establishing multiple strategic alliances. Petralia was also one of the founders of worthknowing.com, a consumer financial services portal. She holds a B.A. in english literature from Furman University.

### Jeff Hodges, Chief Financial Officer

Hodges is the chief financial officer of Kabbage. He has served over 25 years in a financial executive capacity, predominantly in FinTech companies. Prior to joining Kabbage, Hodges served as CFO of: Avangate, Inc., an international payments platform provider; Official Payments, a payment facilitator; Firethorn Holdings, a mobile banking and mobile wallet provider; PRESolutions, a provider of prepaid transaction processing solutions; and nFront, an online banking and bill payment provider. Previously, he served as vice president and controller of Powertel, a cellular phone company and as an audit manager of Arthur Andersen. Hodges has a BS in accounting from Auburn University.

### Kevin Phillips, Head of Corporate Development

Phillips is the head of corporate development at Kabbage. Phillips served as chief financial officer of Kabbage through December 2015. Prior to his appointment as CFO, he was Kabbage's chief technology officer responsible for the development of Kabbage's technology platform. Phillips spent the previous seven years as chief operating officer of Scientific Intake, a Class 1 medical device company. Prior to Scientific Intake, Phillips served as chief information officer of several Atlanta based technology companies. After starting his career with Deloitte, he also had senior technology and operational roles in Europe and the United States. He has an undergraduate degree from Washington College in Chestertown, Maryland and an MBA from Georgia State University.

**KBRA** **KROLL BOND RATING AGENCY**

# Originations

## Kabbage

Kabbage targets marketing of the Kabbage Program towards small businesses with 1 to 50 employees, $50,000 to $10 million in annual revenue, and across all industry verticals. Kabbage's marketing department, which consists of approximately 20 employees, focuses on brand marketing to grow awareness, acquisition programs through direct channels to acquire customers, site and funnel optimization to increase conversion for applications, and customer loyalty marketing to drive utilization.

Kabbage sources customers through multiple acquisition channels, including: (1) search engine marketing and search engine optimization, (2) direct mail, (3) strategic referral partners, (4) Facebook and other display advertising, (5) radio and brand advertising, and (6) content marketing and press. Kabbage sources loans on behalf of Celtic Bank in all 50 states, U.S. territories and the District of Columbia.

All SMB Loans are originated in the name of Celtic Bank, and Kabbage arranges financing for the Kabbage Program by purchasing the receivables associated with such loans. Since inception, Kabbage has funded over $2.7 billion for over 90,000 customers. Through the Kabbage Platform, there have been originations of $1.2 billion, $889 million and $341 million in 2016, 2015, and 2014, respectively.

## Celtic Bank

Under the Kabbage Program, Celtic Bank underwrites, originates and funds the SMB Loans made to Merchants under the Kabbage Program. Kabbage serves as the program manager and provides marketing, origination, application processing, loan servicing and collection services for all SMB Loans originated by Celtic Bank. All program materials and changes, including any statements, disclosures or promotional materials are subject to review and approval by Celtic Bank. Kabbage has agreed to purchase all receivables associated with such SMB Loans, which receivables represent an undivided ownership interest in up to 100% of all amounts due or to become due by the Merchants under the related agreement. The transaction documents allow Kabbage to contract with another funding bank to originate receivables to be sold to the Issuer during the Revolving Period without noteholder consent, although rating agency confirmation would be required.

The agreement between Kabbage and Celtic Bank is scheduled to terminate in March 2019 but is subject to automatic renewal for successive one year terms unless either Kabbage or Celtic Bank provides notice of non-renewal to the other party at least 60 days prior to the end of the initial term or any subsequent renewal term. The agreement with Celtic Bank is not exclusive and does not prohibit Celtic Bank from working with competitors of Kabbage or prohibit Kabbage from potentially entering into bank relationships with other funding banks ("Credit Sponsors").



# Underwriting

Underwriting for qualified Merchants and, by extension, SMB Loans made under the Kabbage Program are governed by Celtic Bank's credit policy. As the program manager, Kabbage applies Celtic Bank's credit policy as part of the underwriting process. The underwriting process for SMB Loans is fully automated. Celtic Bank uses the Kabbage Platform and related technology, including Kabbage's proprietary risk scoring model, to apply its credit policy to generate automated credit decisions.

Kabbage maintains certain credit policy requirements for all loans. Any loan that meets these predetermined requirements receives a loan offer that is subject to completion of all verification processes prior to being funded.

| Group Credit Policy Requirements* | |
|---|---|
| Maximum Loan Term | 36 months |
| Maximum Loan Amount | $400,000 |
| Minimum Time in Business | 1 year |
| Minimum FICO score | 539 |
| Minimum Kabbage Score | 300 |
| Minimum Annual Revenue or | $12,000 |
| Minimum Average Bank Balance | $3,000 |

\* Loans in excess of 18 months, exceed $250,000, or a Kabbage Score of less than 560 will not be included in this transaction.

Underwriting decisions are made by a methodology that encompasses the following four categories:

- <u>Authentication</u>: Kabbage utilizes multiple information sources to verify the applicant and ownership of the business.
- <u>Exposure Capacity</u>: Each Merchant will be analyzed according to an appropriate model to determine cash flow available for financing.
- <u>Character</u>: Applicant's experience, motivation and character of the business (such as customer reviews/feedback) will be evaluated.
- <u>Consistency</u>: Cash flow efficiencies and revenue generation from the business's operation are analyzed.

Kabbage's proprietary risk scoring model assigns each applicant a score (the "Kabbage Score") ranging from 300 to 850. Applicants with lower Kabbage Scores have a higher probability of becoming a delinquent or defaulted receivable. Receivables with a Kabbage Score of less than 560 will not be eligible in this transaction.

Kabbage utilizes a proprietary risk model to assess the risk of prospects and applications. The Kabbage risk scoring model considers thousands of data elements from multiple sources including the credit bureaus, business sales performance, and information collected during the underwriting process to ensure that a full spectrum of knowledge on the borrower is acquired to assess risk. These borrower attributes relate to:

- Business Performance
- Business Characteristics
- Contract Risk
- Applicant's Consumer Credit Report
- Macroeconomic Factors
- Past Performance
- Online Footprint

# Financial Condition and Liquidity

Kabbage has incurred operating losses since its inception; however, the Company expects to be profitable by the fourth quarter of 2017. Total revenue in 2016 has been approximately $171.9 million compared to $65.5 million for 2015. Kabbage intends to expend significant funds to continue to grow its business, including to acquire customers and to fund ongoing operations. To date, Kabbage has financed its operations through the issuance of debt and equity.

As of year-end 2016 Kabbage had $160.0 million dollars in cash, with approximately $27.0 million unrestricted and available for immediate liquidity. Kabbage has an existing debt facility scheduled to enter into an amortization period on March 20, 2017, at which time the amount of funding available under such facility will begin to decrease. It is expected that the proceeds of the sale of the Series 2017-1 Notes will be used to refinance Kabbage's existing debt facility in full. However, the "expandable" feature, as well as the Revolving Period, in Kabbage 2017-1 provides additional funding capacity for Kabbage.

# Servicing

Kabbage will act as Servicer for this transaction and First Associates Loan Servicing, LLC will act as backup servicer. In servicing the loans, Kabbage will be required to follow the same collection policies and procedures it will follow with respect to comparable SMB Loans that it owns or services for others.

The Servicer's servicing team uses the loan servicing platform to monitor and track payment activity. With built-in payment tracking functionality and automated missed payment notifications, the loan servicing platform allows the Servicer to monitor performance of outstanding loans on a real time basis.

Kabbage's customer service and collections teams are staffed by personnel located in the Kabbage's Atlanta office. Kabbage's collections representatives, which consist of about 15 personnel, are responsible for attempting to contact borrowers who have not made or are in danger of not making their minimum payments. Kabbage outsources some collections activity to external collections agencies for purposes of benchmarking internal collections performance as well as maintains relationships with such agencies in the event of disaster recovery situations or short-term capacity shortages.

The servicing policies and procedures currently used by Kabbage are:

- Loan Payments: The loan servicing platform automatically initiates an ACH or PayPal debit for scheduled payments on loans in accordance with the applicable payment schedule and tracks payment flow.

- Delinquency Management: A loan is characterized as delinquent if any scheduled loan payment has not been received in full by the next cycle date. A scheduled loan payment is missed when an ACH or PayPal debit attempt is not successful due to a lack of funds.

- Charge-Offs: An account is charged-off on or before the last day of the month in which the account becomes 180 days past due. In certain circumstances, an account may be manually charged-off prior to such date subject to internal approvals. For example, in the case of a bankruptcy of the customer, Kabbage will charge-off an account within 60 days of receipt of bankruptcy filing, if not sooner.

**KBRA** KROLL BOND
RATING AGENCY

# <u>Regulatory</u>

SMB Loans are originated by Celtic Bank, a Utah state chartered industrial bank insured by the Federal Deposit Insurance Corporation (FDIC) and regulated by the Utah Department of Financial Institutions and the FDIC. As a service provider to Celtic Bank, Kabbage is subject to regulation and supervision of the FDIC under the Bank Service Company Act.

Although Merchants agree that they are entering into a commercial transaction and that the proceeds of the SMB Loans will be used solely for business purposes and will not be used for personal, family, or household purposes, if the SMB Loans deemed not to constitute business loans, Kabbage could become subject to the purview of the CFPB and other additional federal and state regulatory agencies.

Kabbage and the loans originated through the Kabbage Platform must comply with applicable federal, state and local regulation including (but not limited to):

- Fair Credit Reporting Act

- Equal Credit Opportunity Act

- Bank Secrecy Act

- Service Members Civil Relief Act

- Federal Trade Commission Act

- Telephone Consumer Protection Act

- Electronic Signatures in Global and National Commerce Act

Kabbage's internal policies and procedures have been reviewed by its internal legal and compliance staff with advice in certain instances from external regulatory compliance counsel. Kabbage has built its systems and processes with controls in place in order to permit its policies and procedures to be followed on a consistent basis.

Kabbage is rated A+ by the Better Business Bureau and has received few complaints on the CFPB's website.

# Historical Performance

## Originations

Kabbage originates loans with Kabbage Scores ranging from 300 to 850. Receivables with a Kabbage Score of less than 560 will not be eligible in this transaction. Kabbage first originated 6-month loans in 2011 and 12-month loans in January 2015. As shown below, borrowers who receive a 12-month loan typically have higher Kabbage Scores than those who obtain a 6-month loan.

### 6-month Receivables

The table below displays originations for 6-month Receivables by year for 2011 through 2016.



### 12-month Receivables

The table below displays originations for 12-month Receivables by quarter for Q2 2015 through Q4 2016.



**KBRA** KROLL BOND RATING AGENCY

# Gross Charge-Offs

The tables below show historical information relating to cumulative gross charge-offs as a percentage of original receivable balance made through the Kabbage Platform since 2011 segmented by original term and Kabbage Score. Applicants with lower Kabbage Scores have a higher probability of becoming a delinquent or defaulted receivable.

## 6-month Receivables

The table below displays gross charge-offs for 6-month Receivables since 2011 by year and by quarter for 2016.

| Gross Charge-Offs Kabbage Score | Vintage 2011 | Vintage 2012 | Vintage 2013 | Vintage 2014 | Vintage 2015 | Vintage Q1 2016 |
|---|---|---|---|---|---|---|
| 300 to 599 | 22.02% | 31.01% | 21.22% | 10.11% | 11.51% | 5.32% |
| 600 to 640 | 16.07% | 8.94% | 12.28% | 12.27% | 11.32% | 5.79% |
| 641 to 680 | 3.20% | 5.47% | 7.34% | 9.98% | 9.01% | 4.64% |
| 681 to 720 | 1.23% | 3.99% | 5.43% | 6.98% | 6.49% | 3.44% |
| 721 to 850 | 2.20% | 0.28% | 3.21% | 6.37% | 4.41% | 2.53% |
| Weighted Average* | 12.38% | 11.94% | 7.83% | 8.73% | 7.56% | 3.96% |

* Percentages are weighted by funded amount.

## 12-month Receivables

The table below displays gross charge-offs for 12-month Receivables since 2015 by quarter.

| Gross Charge-Offs Kabbage Score | Vintage Q2 2015 | Vintage Q3 2015 | Vintage Q4 2015 | Vintage Q1 2016 |
|---|---|---|---|---|
| 300 to 599 | 10.15% | 0.00% | 11.64% | 1.39% |
| 600 to 640 | 14.90% | 15.53% | 9.13% | 5.10% |
| 641 to 680 | 5.12% | 8.17% | 7.13% | 3.81% |
| 681 to 720 | 8.12% | 6.35% | 5.25% | 2.17% |
| 721 to 850 | 6.96% | 3.74% | 3.09% | 0.93% |
| Weighted Average* | 7.43% | 6.06% | 5.38% | 2.20% |

* Percentages are weighted by funded amount.

Kabbage may sell charge-offs to third-parties in exchange for a small percentage of the remaining unpaid balance of Receivables. Kabbage may also outsource collections activity on charge-offs instead of selling charge-offs. Note that KBRA assumed no recoveries in its analysis of the transaction.

**KBRA** **KROLL BOND RATING AGENCY**

# KBRA Loss Expectation

KBRA has analyzed Kabbage's historical static pool cumulative gross charge-off data since 2011, segmented by Kabbage Score and original term in order to develop a KBRA base case loss expectation per **KBRA's General Rating Methodology for Asset-Backed Securities**:

- Kabbage Score

- Original Term

To account for limited data, KBRA analyzed publically available static pool loss data for comparable business loan and marketplace lending programs. This proxy data, in addition to Kabbage's management loss analysis, was used to help derive and validate the base case loss assumptions for each Kabbage Score range and original term.

To account for the limited data, additional stresses were applied to the KBRA base case loss assumption and multiples were stressed for each KBRA stress scenario for the applicable note rating category.

Using this analysis and assuming the Receivables migrate to the "worst case" portfolio by Kabbage Score and original term mix allowed by the Excess Concentration Amounts and Eligibility Criteria, KBRA derived a weighted average base case loss rate of approximately 10.0%.

# Cash Flow Analysis

KBRA performed a cash flow analysis to test the transaction structure and assess whether the proposed enhancement levels are sufficient to warrant the requested ratings for each of the rated Notes. KBRA did not incorporate prepayments, recoveries on charged-off loans, and assumed Kabbage is no longer the Servicer in its cash flow analysis.

In instances where a scenario is indicated by "PASS", the transaction's cash flows were sufficient to support the timely payment of interest and ultimate repayment of principal by the legal final payment date for the respective class of Notes. The multiple shown below is compared to the KBRA base case loss rate of 10.0%.

| Kabbage 2017-1:  KBRA Stress Scenario Summary | | | | | |
|---|---|---|---|---|---|
| Notes | Scenario | Gross Charge-Offs | Multiple from Base Case | Result | KBRA Rating |
| Class A | "A" Stress | 35.0% | 3.50x | PASS | A (sf) |
| Class B | "BBB" Stress | 25.0% | 2.50x | PASS | BBB (sf) |
| Class C | "BB" Stress | 20.0% | 2.00x | PASS | BB (sf) |
| Class D | "B" Stress | 15.0% | 1.50x | PASS | B (sf) |

**KBRA** KROLL BOND RATING AGENCY

# Rating Sensitivity and Surveillance

KBRA's rating of the Notes represents a blended analysis of the key credit risk determinants. Events that may result in a rating change to the ABS transaction include, but are not limited to, the following:

- Changes to the Company's business strategy, management team, ownership structure or operations that cause KBRA to reassess its view of the Servicer;

- Deterioration in the transaction's asset performance that exceeds the Company's historical experience;

- Modifications of the transaction's structure or significant changes to the collateral; and

- A replacement of the Servicer.

After the initial rating is assigned, KBRA will continue to monitor the transaction until the Notes are fully repaid. Ongoing surveillance of the Notes is critical to maintaining the value of the rating. KBRA's surveillance process for securitization transactions involves a periodic review of the following:

- Servicing reports to determine if all payment obligations are met and the transaction is in compliance with all triggers and excess concentration amounts;

- Trends in collateral performance relative to historical experience; and

- The Company's financial performance and condition.

The information gathered during regular surveillance will indicate whether or not a more thorough review is warranted. Additional information may be requested if KBRA believes the credit quality of the transaction has changed from the time of the initial rating assignment or the most recent review. If warranted, KBRA will conduct an in-depth surveillance review that may result in a change to the transaction's rating and publish commentary explaining the analysis.



# Transaction Structure

**Legal Structure**

| Transaction Structure | The Notes are newly issued asset-backed securities collateralized by a revolving pool of receivables. The following diagram illustrates the basic securitization structure: |
|---|---|



(1) On the closing date, the Seller will transfer receivables arising under business loans or merchant cash advances to the Issuer for cash available from the sale of the Series 2017-1 Notes or as a contribution of capital to the Issuer. From time to time thereafter, the Seller may transfer additional receivables to the Issuer for cash available from payments on the receivables owned by the Issuer, the issuances of additional Series 2017-1 Notes or other series of notes or otherwise as contributions of capital to the Issuer.

(2) The Issuer pledges the receivables it acquires from the Seller and certain other assets to the Indenture Trustee to secure its notes, including the Series 2017-1 Notes.

(3) The Issuer issues the Series 2017-1 Notes and from time to time in the future may issue additional Series 2017-1 Notes and other series of notes.

(4) The Servicer services the receivables and remits payments on the receivables received from the merchants to the collection account. The Backup Servicer will provide certain services in respect of reports generated by the Servicer and other matters and, in the event that the Servicer is terminated after a Servicer Default, will agree at the request of the Indenture Trustee (acting at the direction of the Requisite Noteholders) to act as the successor servicer.

(5) The Issuer uses collections on the receivables allocated to the Series 2017-1 Notes to make payments on the Series 2017-1 Notes and during the revolving period to purchase additional receivables from the Seller, in each case pursuant to the payment priorities described in the offering document.

For further details, see the respective offering document.

**KBRA**
**KROLL BOND RATING AGENCY**

| | |
|---|---|
| Expandable Notes | The Notes are "expandable" term notes such that at any time during the Revolving Period, the Issuer may periodically issue additional Series 2017-1 Notes, subject to the following conditions: |
| | (a) such issuance does not cause the maximum issuance amount of each class to exceed certain amounts as described in the transaction documents; |
| | (b) the rating agency condition is satisfied; |
| | (c) the Issuer and the Receivables to be acquired by the Issuer in connection with such issuance satisfy all conditions set forth in the transaction documents; and |
| | (d) at the time of such issuance a Rapid Amortization Event has not occurred and is not continuing. |
| | Each additional issuance of Notes will have the same terms as the corresponding Class of Series 2017-1 Notes issued on the closing date, including the same Note Rate, Legal Final Payment Date and CUSIP. |
| Priority of Payments | The priority of payments will generally be as follows: |
| | (1) Fees, expenses and indemnities to service providers (up to a cap); |
| | (2) To the Servicer, any unreimbursed servicer advances; |
| | (3) If Kabbage is no longer the Servicer or if an Event of Default has occurred and is continuing, to the Servicer, the servicing fees; |
| | (4) To the Backup Servicer, backup servicing fees (up to a cap); |
| | (5) Interest on the Series 2017-1 Notes, paid sequentially; |
| | (6) During the Series 2017-1 Revolving Period, an amount equal to the Series 2017-1 Asset Deficiency Amount, if any, to the Series 2017-1 Excess Funding Account; |
| | (7) During the Series 2017-1 Revolving Period, the amount needed to replenish the Series 2017-1 Reserve Account, if any; |
| | (8) After the Series 2017-1 Revolving Period, principal on the Series 2017-1 Notes, paid sequentially; |
| | (9) Fees, expenses and indemnities to service providers (without a cap); |
| | (10) If Kabbage is the Servicer and no Event of Default has occurred and is continuing, to the Servicer, the servicing fees; |
| | (11) If Kabbage is no longer the Servicer, to the Servicer, the supplemental servicing fee; |
| | (12) All remaining funds to or at the direction of the Issuer. |
| Revolving Period | The transaction features a revolving period (the "Series 2017-1 Revolving Period"), which will end on the earlier of (i) the payment date occurring in the month that is 36 months after the closing date and (ii) the date on which a Rapid Amortization Event has occurred. |
| | There will only be one Revolving Period, and such period cannot be re-commenced or continue after it has terminated. |

**KBRA** KROLL BOND RATING AGENCY

| | |
|---|---|
| Rapid Amortization Events | The following events will be automatic "Rapid Amortization Events" with respect to the Series 2017-1 Notes: |
| | • the occurrence of any of the following events (each a "Trigger Event") as of any payment date: |
| |     o   the three-month weighted average receivables yield on such payment date is less than 38.00%, |
| |     o   the three-month weighted average excess spread on such payment date is less than 8.00%; or |
| |     o   the three-month average delinquency ratio on such payment date is greater than 15.00%; |
| | • an asset deficiency exists for three or more business days; |
| | • a Servicer Default occurs; |
| | • an Event of Default with respect to the Series 2017-1 Notes occurs under the transaction documents; or |
| | • either the Seller or the Servicer suffers certain specified bankruptcy or insolvency events. |
| Events of Default | The occurrence of any of the following events will constitute an "Event of Default" under the indenture: |
| | (a)   failure to pay interest when due for five business days; |
| | (b)   failure to pay principal when due; |
| | (c)   failure by the Issuer to observe or perform any covenant or agreement in the transaction documents and that failure has a materially and adverse effect on holders of the Notes and continues or is not cured for 30 days; |
| | (d)   the receipt by the Issuer of a final determination that it will be treated as an association taxable as a corporation for federal income tax purposes; |
| | (e)   the Issuer is an "investment company" within the meaning of the Investment Company Act; |
| | (f)   certain bankruptcy or insolvency events occur with respect to the Issuer; |
| | (g)   the Indenture Trustee fails to have a valid and perfected first priority security interest in the collateral and such failure continues for five business days; |
| | (h)   the occurrence of a Receivables File Discrepancy Event; or |
| | (i)   any of the transaction documents ceases for any reason to be in full force and effect other than in accordance with its terms. |

| | |
|---|---|
| **Excess Concentration** | The Receivables are subject to certain concentration limits that, when exceeded, will be excluded from the Series 2017-1 Adjusted Pool Balance which will require the Issuer to maintain additional credit enhancement for the Series 2017-1 Notes. Such concentration limits are based on the amounts, without duplication, in excess of the following limits, determined as a percentage of the aggregate outstanding receivables balance of Eligible Receivables (collectively, the "Series 2017-1 Excess Concentration Amounts"): |

| Kabbage 2017-1 Excess Concentration Amounts | | |
|---|---|---|
| **Concentration Amount** | **Kabbage 2017-1 Limit %** | **Kabbage 2017-1 % of Statistical Pool** |
| Merchants located in California | 20.00% | 15.80% |
| Merchants located in Florida | 15.00% | 10.43% |
| Merchants located in Texas | 15.00% | 7.94% |
| Merchants located in New York | 15.00% | 7.24% |
| Merchants located in any other single state | 10.00% | 4.05% |
| Merchants with Outstanding Receivables Balances greater than $75,000 | 40.00% | 2.99% |
| Merchants with Outstanding Receivables Balances greater than $125,000 | 20.00% | 0.00% |
| Merchants in business for less than 1 year | 0.00% | 0.00% |
| Merchants in business for less than 2 years | 10.00% | 4.90% |
| Merchants in business for less than 3 years | 40.00% | 18.01% |
| Merchants in business for less than 4 years | 60.00% | 29.59% |
| Receivables with a remaining term of 7 to 18 months | 50.00% | 40.97% |
| Receivables with (a) a remaining term of 13 to 18 months and/or (b) an Outstanding Receivables Balance between $150,000.01 and $250,000.00; provided, however, that each such Receivable has a minimum Kabbage Score of 700 | 10.00% | 0.00% |
| Receivables that are 30 to 59 days past due | 8.00% | 2.37% |
| Receivables that are 60 or more days past due | 0.00% | 0.00% |
| Receivables with a Kabbage Score less than 600 | 5.00% | 1.22% |
| Receivables that are subject to Material Modifications | 5.00% | 4.39% |
| Receivables that relate to Renewal Loans | 15.00% | 0.00% |
| Merchant businesses in highest concentration industry* | 25.00% | 10.45% |
| Merchant businesses in highest 2 concentration industries* | 30.00% | 17.69% |
| Merchant businesses in highest 5 concentration industries* | 45.00% | 25.13% |
| Merchant businesses in highest 10 concentration industries* | 70.00% | 31.19% |
| Merchants that have not agreed to make payments through ACH or PayPal (or other electronic payment service) | 5.00% | 3.40% |

\* Industries are classified by NAICS industry code. For purposes of this test, Receivables relating to Merchants in unclassified industries will be counted as part of a single industry.

| | |
|---|---|
| **Reserve Account** | The "Series 2017-1 Reserve Account" is fully funded on the closing date with $2,777,778, which is approximately 0.50% of the aggregate principal balance of the Series 2017-1 Notes divided by 94.50%. The Series 2017-1 Reserve Account will be available to pay transaction expenses and interest on the Series 2017-1 Notes. |

| Eligibility Criteria | Criteria for an "Eligible Receivable" will include, among other things, that each such receivable: |
|---|---|
| | • arises in the ordinary course of the Seller's or the Credit Sponsor's business and was originated in accordance with, and conforms to, the credit policies; |
| | • was originated by the Seller or the Credit Sponsor in compliance with all applicable laws and regulations and remains in compliance with all applicable laws and regulations; |
| | • is due from an Eligible Merchant; |
| | • is not (i) 60-days past due or (ii) if the acquisition of such Receivable by the Issuer would result in any excess concentration limitation applicable to 30-days past due receivables to be exceeded, 30-days past due; |
| | • is denominated in U.S. dollars; |
| | • if such Receivable has an original principal amount that exceeds $250,000, then only $250,000 will be eligible; |
| | • is a monthly (or more frequent pay) receivable; |
| | • has an original term less than or equal to 18 months; |
| | • does not have a maturity date later than six months prior to the earliest legal final maturity date of any series of Notes outstanding; |
| | • has a receivable yield greater than or equal to 19.00% per annum; |
| | • together with all other Eligible Receivables, has a weighted average receivables yield of at least 38.00% per annum; |
| | • together with all other Eligible Receivables, has a weighted average remaining term of no more than 13 months; |
| | • has received Kabbage Score of no less than 560; |
| | • has received a FICO score of no less than 539; |
| | • relates to Merchants with a weighted average Kabbage Score of 675 or greater as of the date of its underwriting; and |
| | • if has an 18-month original term, then such Receivable has (i) a Kabbage Score of at least 700, (ii) the related Merchant has been in business for at least 3 years and (iii) the related Merchant has annual gross revenue of at least $150,000 per annum. |
| Eligible Merchant | Criteria for an "Eligible Merchant" will include, among other things, that each such receivable: |
| | • is domiciled in the United States; |
| | • is not subject to any proceedings under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect and |
| | • is a business that has been operating for at least one year. |

**KBRA** KROLL BOND
RATING AGENCY

| | |
|---|---|
| Servicer Defaults | The occurrence of any of the following events will constitute a "Servicer Default" under the servicing agreement: |
| | (a) the Servicer fails to make any payment, transfer or deposit to the Indenture Trustee on the date that payment, transfer or deposit was due and such failure shall continue for five business days; |
| | (b) any representation or warranty made by the Servicer in the servicing agreement or in any statement or certificate at any time given by the Servicer in writing pursuant to the transaction documents is incorrect when made and such inaccuracy has a material and adverse effect on the interests of the holders of the Notes and such inaccuracy is not cured for a period of 30 consecutive days; |
| | (c) any failure by the Servicer to comply with any of its agreements or covenants contained in the transaction documents and such failure has a material and adverse effect on the interests of the holders of the Notes and such failure is not cured for a period of 30 consecutive days; |
| | (d) certain bankruptcy or insolvency events shall have occurred with respect to the Servicer; |
| | (e) the three-month average excess spread on such payment date is less than 8.00%; or |
| | (f) the three month average delinquency ratio on such payment date is greater than 15.00%. |
| Representations and Warranties | For more detailed information regarding the representations, warranties and enforcement mechanisms available under the transaction documents, please see KBRA's Kabbage Asset Securitization LLC, Series 2017-1 Representations and Warranties Disclosure available **here**. |

**KBRA** KROLL BOND
RATING AGENCY

© Copyright 2017, Kroll Bond Rating Agency, Inc., and/or its licensors and affiliates (together, "KBRA"). All rights reserved. All information contained herein is proprietary to KBRA and is protected by copyright and other intellectual property law, and none of such information may be copied or otherwise reproduced, further transmitted, redistributed, repackaged or resold, in whole or in part, by any person, without KBRA's prior express written consent. Ratings are licensed by KBRA under these conditions. Misappropriation or misuse of KBRA ratings may cause serious damage to KBRA for which money damages may not constitute a sufficient remedy; KBRA shall have the right to obtain an injunction or other equitable relief in addition to any other remedies. The statements contained in this report are based solely upon the opinions of KBRA and the data and information available to the authors at the time of publication of this report. All information contained herein is obtained by KBRA from sources believed by it to be accurate and reliable; however, KBRA ratings are provided "AS IS". No warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability, or fitness for any particular purpose of any rating or other opinion or information is given or made by KBRA. Under no circumstances shall KBRA have any liability resulting from the use of any such information, including without limitation, for any indirect, special, consequential, incidental or compensatory damages whatsoever (including without limitation, loss of profits, revenue or goodwill), even if KBRA is advised of the possibility of such damages. The credit ratings, if any, and analysis constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. KBRA receives compensation for its rating activities from issuers, insurers, guarantors and/or underwriters of debt securities for assigning ratings and from subscribers to its website.